Joseph GARDESKI, Hazel Gardeski, Vincent J. LaRocca, Michael Celuch, Louis J. Clausi, Joseph J. Tiano, Russell J. Costello, Thomas Mottsey, Acker Bus Lines, Inc., Edward Acker, Lucille Acker, Steven Gardeski, Helen Gardeski, Margaret Carpino, Dominic Tiano, Thomas Carpino, Richard Carpino, Stanley Gardeski, Louis Gardeski, Eva Clausi, Rose Tripoli, Chris Lindhurst, Frank D. Rittie, John Pirigyi, Leo Stopczynski, Margaret Chellemo, Theresa Ferrendino, Frank Costello, Clyde Robbins, Stanley Szynansky, Vernon J. Lewis, Jennie Lewis, Anthony Alecca, Jr., Margaret Alecca, Paul Natale, Leslie D. Elliott, George W. Acker, Paul E. Smith, Gloria Guido, Anthony Guido, Russell R. Mottsey, Emil LaRocca, Frances LaRocca, John A. Iconelli and Anna Denter, individually and on behalf of a class of all others similarly situated, Plaintiffs,

v.

COLONIAL SAND & STONE CO., INC., Hudson Cement Corp., Strelene Realty Corporation and Independent Cement Corp., Defendants.

No. 79 Civ. 1554.

United States District Court,
S. D. New York.

Nov. 24, 1980.

Department of State is prepared to make such a presentation should the Court wish.

**1160**

Gerald Orseck, Liberty, N. Y., for plaintiffs.

DeGraff, Foy, Conway, Holt--Harris & Mealey, Albany, N. Y., for defendant, Independent Cement Corp., by Michael J. Cunningham, Albany, N. Y.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Colonial Sand & Stone Co., Inc., Hudson Cement Corp. and Strelene Realty Corp., by Robert L. Laufer, Neal Johnston, New York City.

## OPINION

SOFAER, District Judge:

This is a citizens' suit brought to enforce the anti-pollution standards of the federal Clean Air Act, 42 U.S.C.A. §§ 7401–7626 (Supp.1979). Plaintiffs are forty-five persons who live, work, or own businesses or real property in the vicinity of a cement plant located in East Kingston, New York. They allege that the plant has operated since 1976 in violation of the emission standards of both the Clean Air Act and New York state law. In particular, they claim that the plant's emissions of dust and particles have far exceeded permissible limits; that repeated requests and warnings, both private and public, failed to cause defendants to cease their illegal conduct; and that the emissions have damaged plaintiffs' health and property.

In Part I of their complaint, plaintiffs seek injunctive relief under the Clean Air Act to prevent future violations of emission standards. In Part II, plaintiffs seek money damages under state law for injuries sustained due to past violations.[1] Claims under Part II may properly be considered under the doctrine of pendent jurisdiction only if subject matter jurisdiction exists over the claim in Part I.

The defendants include the owner of the plant, Colonial Sand & Stone Company ("Colonial"); Colonial's wholly owned subsidiaries Strelene Realty Company (the owner of the underlying real .estate) and Hudson Cement Corporation (which at one time performed financial services in connection with the ownership of the plant); and the lessee and operator of the plant, International Cement Corporation ("ICC"). Defendants have filed motions to dismiss and for summary judgment on several grounds, including lack of subject matter jurisdiction and, most recently, mootness. This opinion deals with the mootness claim, and with the

---

1. Plaintiffs also assert that violations of federal common law and statutes give rise to federal question jurisdiction of Part II of this action under 28 U.S.C. § 1331. Plaintiffs claim for money damages does not, however, arise under any federal law. This is not a case involving the federal common law of interstate pollution. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). Moreover, damages do not appear to be available to private litigants who sue under the Clean Air Act.

assertion by defendants that enforcement efforts of the New York State Department of Environmental Conservation ("DEC") are sufficient to preclude jurisdiction under a statutory provision that bars citizen suits where a "State has commenced and is diligently prosecuting a civil action in a court of . . . a State" to require compliance with the statute. 42 U.S.C.A. § 7604(b)(1)(B) (Supp.1979).

## I. Mootness

■ ICC has moved to dismiss Part I of the complaint as moot. ICC has occupied the cement plant since approximately April, 1978 under a lease arrangement with defendants Colonial and Strelene. The original lease was for one year, with renewals at ICC's option for periods through March 31, 1981 and March 31, 1984. ICC exercised its first option, thereby extending the lease term to March 31, 1981. On June 6, 1980, however, ICC, citing the prohibitive cost of rehabilitation, announced its intention to discontinue operating the plant immediately and permanently. A month later, on July 14, 1980, ICC gave written notice to Colonial and Strelene of its intention not to exercise its option to extend the lease beyond March 31, 1981. ICC claims that, since it does not own and no longer operates the facility, no activity remains to be enjoined by this action.

The Supreme Court has refused on several occasions to hold that an action is moot merely because a defendant terminates allegedly improper conduct. In *United States v. Trans–Missouri Freight Ass'n*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897), the dissolution of a freight association whose activities had been challenged under the Sherman Act did not prevent the Court from enjoining future illegal activities. Similarly, in *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), an action was brought to enjoin violations that resulted from one individual maintaining interlocking directorates in three sets of competing corporations. After the complaint was filed, the individual resigned the offending positions, and the defendants moved to dismiss the case as moot.

But the Court refused to require dismissal, stating that "voluntary cessation of allegedly illegal conduct . . . does not make the case moot," since otherwise the defendant would be free to resume his former conduct. *Id.* at 632, 73 S.Ct. at 897.

The Court took essentially the same position under a similar fact situation in *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968), noting that a case may be moot if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, but mere statements that it would be uneconomical to engage in such acts "cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those in appellee's shoes." *Id.* at 203, 89 S.Ct. at 364 (citing *W. T. Grant, supra*, 345 U.S. at 633, 73 S.Ct. at 897).

ICC has not met the burden of proving this action is moot. While ICC has apparently ceased operating the cement plant, it remains legally empowered to recommence the challenged activities. ICC will continue to hold the plant as lessee until at least March 31, 1981, when its current lease expires. Furthermore, although ICC has notified Colonial and Strelene that it will not exercise its option to extend the lease until 1984, ICC may in fact be free to negotiate a new lease agreement when the current one expires. So long as the plant remains standing it could be used again, by ICC, Colonial, Strelene, or by another lessee or sublessee.

If the defendants have in fact given up using the plant or permitting its use, then an injunction may be unnecessary. But the case is not moot. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Oregon State Medical Society*, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

## II. Subject Matter Jurisdiction

### A. Statutory Framework

The Clean Air Act, as amended, 42 U.S. C.A. §§ 7401–7626 (Supp.1979), is the product of successive efforts by Congress since 1955 to come to grips with the nation's air

pollution problem. *See generally* F. Grad, Environmental Law § 3.03 (2d Ed. 1978). The Act is designed "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C.A. § 7401(b)(1) (Supp.1979). Primary responsibility for enforcing the statutory standards of the Clean Air Act is left to state and local governments. *Id.* § 7401(a).

In 1970, responding to the view that state and local efforts had failed adequately to control air pollution, Congress for the first time created a mechanism to establish specific air quality standards that each state would be obligated to enforce. Clean Air Act Amendments of 1970, Pub.L.No.91–604 § 4(a), 84 Stat. 1678 (1970) (codified in 42 U.S.C. § 7401(a) (Supp.1979)). To ensure that state and local governments would fulfill their obligations under the Act, Congress added a provision permitting suits by private citizens in federal court to enforce the substantive standards set forth in the statute. Section 304(a) of the Clean Air Act, 42 U.S.C.A. § 7604(a) (Supp.1979), reads in pertinent part:

> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf
>
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation
>
> . . . .
>
> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order

the Administrator to perform such act or duty as the case may be.

■ The citizen suit provision, if left unqualified, might have worked to remove the primary responsibility for enforcing the Clean Air Act from the states. Congress sought no such result. Its object in permitting citizen suits was only to "motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings." S.Rep.No.1196, 91st Cong., 2d Sess. (1970) at 36–37, *reprinted in* A Legislative History of the Clean Air Act Amendments of 1970 (hereinafter cited as "Legislative History") at 436–37. The citizen suit provision was therefore qualified by statutory language that precludes federal court jurisdiction when the appropriate agency. is diligently prosecuting an action to enforce the statutory standards. Section 304(b)(1)(B), 42 U.S.C.A. § 7604(b)(1)(B) (Supp.1979), provides that "[n]o. action may be commenced . . . if the Administrator [of the federal Environmental Protection Agency ("EPA")] or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order . . . ." [2] Moreover, Congress provided that all prospective plaintiffs must give notice of alleged violations to EPA's Administrator, to the state in which the alleged violations are taking place, and to the alleged violators, at least 60 days before commencing a citizen suit. 42 U.S.C.A. § 7604(b)(1)(A) (Supp. 1979). This interim is designed to provide governmental agencies with an opportunity to act on alleged violations, and thereby to render the citizen suit unnecessary. S.Rep. No.1196, *supra* at 37, in Legislative History, *supra* at 437.

Plaintiffs in this action have satisfied the notice requirement. Defendants contend, however, that actions taken by the New York DEC constitute diligent prosecution of

---

**2.** The provision for citizen suits was originally included in the Senate, but not the House, version of the 1970 bill. The Senate bill did not contain the specific language precluding jurisdiction in cases where there was diligent prose-

cution by a state or federal agency. It is clear from the legislative history, however, that the Senate did intend that this type of limitation be placed on citizen suits.

a civil action within the meaning of section 304(b)(1)(B). Plaintiffs respond, first, that DEC's actions are insufficient irrespective of the agency's diligence, since DEC failed to commence "a civil action in a court of the United States or a State," as the statute requires. Furthermore, plaintiffs contend, even if DEC's administrative actions may be treated as the equivalent of a court suit, the agency has failed to prosecute its administrative enforcement diligently.

**B.  Sufficiency of Administrative Proceedings**

■ The statutory language requires, before jurisdiction may be denied or deferred, that the agency involved be found to have commenced a "civil action" in a "court." In general, a "court" would ordinarily mean something other than an administrative agency. But agencies have been deemed to be courts if "such a classification [is] necessary to achieve statutory goals." *Baughman v. Bradford Coal Co.*, 592 F.2d 215, 217 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). To hold that the Clean Air Act requires agencies to commence a court suit in all cases, in order to retain enforcement control, would be inconsistent with the statutory purpose as well as Congress' desire that the states be primarily responsible for enforcing the Act. Effective enforcement of Clean Air standards is Congress' goal, and it cannot be measured mechanically. A court suit may be unnecessary, for example, because an administrative proceeding has resulted in an enforceable consent judgment; or because an administrative proceeding is underway that may result in substantially the same relief that could be obtained from a court. States usually proceed administratively before going to court, and if the agency involved possesses the necessary authority and is diligent in prosecuting violations the State and its agency may be at least as effective in achieving results as a citizen in the judicial process. Plaintiffs' view of the law would require a state agency (or EPA), once notified of a citizen suit, to terminate administrative action, however successful, and to commence a court suit, however unneces-sary, in order to retain control over enforcement of clean air standards.

■ DEC clearly possesses powers sufficient to compel compliance with air quality standards. Articles 19 and 71 of the New York Environmental Conservation Law (ECL) provide DEC with broad powers of enforcement. Air Pollution Control Act, N.Y.Envir.Conserv.Law §§ 19–0101 to 19–0711 (McKinney) and relevant enforcement provisions in *id.* §§ 71–0101 to 71–3903. Among other things, DEC may inspect and investigate alleged or potential violators, ECL §§ 19–0301, 19–0305; conduct hearings, *id.* §§ 19–0301, 19–0307; propose orders, *id.* § 19–0509; and issue final orders or agree to orders on consent with alleged violators, *id.* §§ 19–0305, 19–0509. DEC determinations are subject only to limited judicial review. *Id.* § 19–0511. DEC also has the power to impose civil penalties on those who violate the ECL, or any "code, rule or regulation which was promulgated thereto; or any order except an order directing such person to pay a penalty ..." *Id.* § 71–2103. Indeed, DEC may impose criminal penalties should such violations be wilfull, *id.* § 71–2105, and may request the Attorney General to seek injunctive relief against any alleged violator, *id.* § 71–2107. Finally, the DEC Commissioner is authorized to issue a summary abatement order, without prior hearing, in certain exigent circumstances. *Id.* § 71–0301.

DEC's substantial powers distinguish its capacity to enforce Clean Air standards from that of Pennsylvania's Department of Environmental Resources. In *Baughman v. Bradford Coal Co., supra*, the Third Circuit held that Pennsylvania's state agency could not be treated as having commenced a civil action, because the agency's only power was to assess a penalty; it had no authority to seek an injunction against air quality violations. 592 F.2d at 218–19. New York's DEC, on the other hand, does have the power to enforce air quality standards. That it may sometimes be forced to go to court to enforce its injunctive order or sanc-

tions is no reason to require it to go to court every time a citizen files suit.[3]

### C. Diligent Prosecution

Assuming that DEC's efforts at the agency level could be regarded as the equivalent of a civil action, DEC must still be shown to be diligently prosecuting some administrative enforcement proceeding. No judicial guidance exists as to what constitutes diligent prosecution. Any such determination must rest at least in part, however, on the agency's enforcement record.

### 1. DEC Enforcement Efforts

DEC was first made aware of possible ICC violations of emission standards when, in 1978, local citizens and politicians complained about air pollution from the plant. According to the affidavit of John Greenthal, then Regional Attorney for the DEC, the agency considered, but rejected, the possibility of seeking an injunction against further violations in state court. DEC's General Counsel at the time, Philip Gitlen, determined that a court was unlikely to enjoin operation of the plant without specific evidence of danger to the health of the community. Greenthal Affidavit, November 1, 1979, at 2–3. At about the same time, DEC also considered and rejected the possibility of pursuing criminal action against ICC. Both DEC and the New York State Department of Law, Environmental Protection Bureau, determined there was a better chance of solving the plant's pollution problems through the use of administrative procedures. *Id.* at 5–6.

DEC's decision to forego court action did not mean that it lacked the power to compel ICC to comply with air quality standards. It began preparing, in fact, for an enforcement action, a relatively formal adjudicatory proceeding. Before a hearing was commenced, however, the parties succeeded in negotiating an Order on Consent, which was signed by the DEC and ICC on December 15, 1978. No amount of diligence, in any court, could likely have produced as satisfactory a result so quickly. The Order included a fifteen–part Schedule of Compliance, detailing how ICC was to meet air quality standards. It also included provisions for civil penalties to be applied in the event that ICC failed to comply with certain portions of the Schedule.

DEC learned soon after the Order was signed, however, that ICC was not meeting the requirements of the Schedule of Compliance. Persons living or working near the plant continued to complain, and DEC personnel confirmed that violations were occurring. On January 18, 1979, plaintiffs served notice of their intention to commence an action in federal court to enforce the air quality standards of the Clean Air Act. An internal DEC memorandum, dated February 16, 1979, described DEC efforts and indicated some dissatisfaction with ICC's performance. Letter from Neil Isabelle, Senior Sanitary Engineer, Air Resources Staff, New Paltz to John Greenthal. But no formal demand for compliance was made, and no enforcement proceeding was commenced.

On March 23, 1979, over 60 days after giving notice of their intention to commence an action, plaintiffs filed this complaint. Four days later, DEC Regional Attorney John Greenthal sent a letter to ICC constituting a "demand for curing" within 30 days of certain violations of the Schedule

---

**3.** The only reported case dealing with the issue is *Baughman v. Bradford Coal Co.*, 592 F.2d 215 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), discussed in text. Plaintiffs may have waived any right to object to a finding that DEC action could be treated as a "court" proceeding. In several documents as well as in oral statements to this Court, plaintiffs conceded that DEC action could fulfill this portion of the statutory language. For example, in one of plaintiffs' mem-

oranda of law they stated: "Plaintiffs readily concede that the holding in [*Baughman*] is applicable here–the N.Y.S. Dept. of Environmental Conservation has the power of a state court with respect to the correction of violations alleged here, and consequently, may be considered a state court as defined in 42 U.S.C. § 7604(b)(1)(B)." Plaintiff's Factual Memorandum: No Diligent Prosecution by State Agency of Compliance Proceedings, September 21, 1979, at 3 n.3.

of Compliance.[4] In addition, the letter to ICC stated that, "[a]lthough the inspections performed to date have revealed violations of other terms, provisions and conditions of the Schedule of Compliance, the Department has determined not to issue 'demands for curing' such conditions at this time." DEC reserved the right to take action on these other alleged violations at a later date.

Plaintiffs have submitted evidence that ICC continued to violate air quality standards despite the demand for curing. Internal DEC documents indicate substantial dissatisfaction with ICC's performance. Particularly instructive is a memorandum sent on May 15, 1979 from Neil Isabelle, Senior Sanitary Engineer on the Air Resources Staff at New Paltz, to John Greenthal. It described continued violations, and suggested there was little hope of correction unless sanctions were imposed:

> Since April 30th when the "Thirty Day Notice" [contained in the demand for curing] expired, representatives of this office have inspected the facility three times. The dates of the inspections were May 8th, 9th and 10th. Many violations of Parts 211 and 220 were noted during each inspection. After a week of warm dry weather, the dust situation at the facility as a whole had been entirely unsatisfactory. It is the collective opinion of the Air Resources staff that Compliance with the Order had been unsatisfactory and operations at the plant are not satisfactory. In view of the on-going violations and apparent recalcitrant attitude, I request that activation of the penalty provisions of the Order be commenced as soon as possible to provide some negative incentive. Further inspections will continue.

Mr. Isabelle concluded that his memorandum was intended "to re-inforce the opinion that the plant is not operating satisfactorily in many aspects and that the firm is not expending enough effort in this area."

At about this time, EPA began to contemplate bringing its own enforcement action. Internal EPA memoranda, dated May 25 and June 4, 1979, detailed ICC violations and concluded that DEC efforts to enforce the December 15, 1978 Order on Consent were likely to proceed slowly. These memoranda suggested that EPA issue its own Notice of Violation pursuant to its statutory authority under section 113(a)(1) of the Clean Air Act, 42 U.S.C.A. § 7413(a)(1) (Supp.1979).[5] On June 21, 1979, EPA sent ICC a Notice of Violation of air quality standards, based on an inspection of ICC conducted on May 18, 1979. ICC was given 30 days to remedy its violations or face the possibility of an injunction and/or civil penalties. It appears, however, that EPA never pursued this attempt to force ICC to comply with air quality standards, despite the fact that an EPA memorandum dated July 23, 1979, reported continuing violations.

On August 8, 1979, DEC informed ICC that it was still violating the Schedule of Compliance. ICC was told either to pay DEC a civil penalty of $50,000 or to file a written notice requesting a hearing on any issue involved in the allegation of non-compliance. The letter also contained another

---

4. The December 15, 1978 Order on Consent provided that the DEC would serve a demand for curing "[i]n the event that the Department alleges that Respondent has violated any term, provision or condition of the Schedule of Compliance." The Order further provided that if ICC failed to comply with such a demand within a period to be specified by the DEC, the DEC would serve written notice of non-compliance and ICC would then have 15 days either to pay the civil penalty specified in the Order or to demand an administrative hearing on the alleged violations.

5. The May 25 Memorandum, sent from F.W. Giaccone, the Chief of the Air Facilities Branch to Robert N. Ogg, Chief of the New York/Virgin Islands Section of the Air Facilities Branch, and to Steven Dvorkin, Chief of the General Enforcement Branch contained the following: "DEC intends to pursue the violation of the order. This could be a slow process. GEB should, therefore, discuss with DEC the possibility of a separate EPA enforcement action. The company has been resistant for several years and all possible pressure should be applied. Based on the above violations, a Notice of Violation should be issued."

"demand for curing" covering violations not specified in the demand of March 27.

During the next three and one-half months DEC and ICC apparently explored ways of obtaining compliance with the December 15, 1978 Order on Consent. On September 24, representatives of DEC, ICC, and EPA met to discuss the situation. ICC promised to respond to DEC proposals and agreed to implement most of the suggestions made. Nevertheless, problems at the cement plant continued. On approximately November 26, 1979, DEC wrote ICC proposing modifications of the 1978 Order "as a resolution to the present compliance problems at the plant." The letter went on to state that "the issuing of the modification would obviate the need to initiate enforcement proceedings and the need for a hearing on the contingent penalty for violation of the original Order." Once again, DEC threatened an enforcement action, this time if the matter was not resolved by November 30, 1979.

Attempts to modify the December 15, 1978 Order failed. On December 14, 1979, one day less than one year after the original Order on Consent was signed, DEC filed a Notice of Hearing and a Complaint setting January 8, 1980 as the date for an administrative hearing to consider ICC's violations of state anti-pollution laws. The complaint alleged, among other things, violations of paragraphs 1, 2, 5, 6, 8, 9, 10, and 12 of the 1978 Schedule of Compliance. The hearing was never held; instead, on approximately January 14, 1980, ICC executed a new Order on Consent, in which ICC agreed to pay DEC $50,000 to cover the expenses DEC had incurred and would incur in monitoring the plant. Otherwise the Second Order on Consent is similar in form to that issued in December 1978. It too contains a Schedule of Compliance and provides for civil penalties in the event ICC fails to live up to its terms.

The precise sequence of events following the signing of the second Order on Consent is unclear. Documents submitted to this Court indicate that, while ICC remained in violation of some aspects of the new Schedule of Compliance, DEC was generally satisfied with ICC's overall performance. As in the past, DEC did not initiate attempts to collect penalties for violations, did not seek injunctive relief in state court, and did not commence an administrative proceeding to enforce air quality standards. *See* Letter of March 24, 1980 from Val Washington, DEC Regional Attorney to Michael J. Cunningham, attorney for ICC. Finally, on June 6, 1980, ICC announced its intention to stop operating the cement plant.

### 2. *Lack of Diligent Prosecution*

■ DEC's initial efforts resulted in the Order on Consent of December 15, 1978. That result should be viewed as sufficient in itself to satisfy the statutory requirement of diligent prosecution, had ICC complied with the Order. To require an agency to commence any form of proceeding would be senseless where the agency has already succeeded in obtaining the respondent's agreement to comply with the law in some enforceable form. Settlements should be encouraged here, as they are in virtually all areas of litigation. The Order established standards for ICC to meet, a schedule of compliance, and a procedure by which DEC could deal with any ICC failure to perform. A litigant would rarely be able to obtain greater relief in an injunctive proceeding, especially where the alleged air pollution violations resulted from constructive economic activity, and where no immediate danger to human health was alleged.

Nevertheless, DEC thereafter failed to meet any reasonable test of diligent prosecution. Events following the December 15, 1978 agreement demonstrate that the Order on Consent was ineffective. But instead of seeking promptly to enforce the Order or commencing an enforcement action, DEC continued to seek voluntary compliance. However diligent these settlement efforts may have been, they were unsuccessful and cannot be equated with the prosecution of an enforcement action. Not until March 27, 1979, after plaintiffs had filed a complaint in this action, did DEC formally demand curing of violations. That demand also was

ineffective. Still, DEC failed to commence an enforcement action, or to invoke the procedures specified in the Order on Consent. On August 8, 1979, DEC issued a second demand for curing of violations of the Schedule of Compliance and announced its intention to seek civil penalties for ICC's failure to comply with the March 27 demand for curing. ICC continued to violate air quality standards, however, and it was not until December 14, 1979, that DEC filed a Notice of Hearing and Complaint. No hearing was held, because a new Order on Consent was obtained. But this Consent once again failed to eliminate all violations, which ended only when ICC voluntarily discontinued its operations. None of the steps DEC took after obtaining the December 15, 1978 Order on Consent can reasonably be characterized as the prosecution of an action.

Defendants press for an approach to the statute that would treat DEC's efforts as sufficient to warrant dismissal. They assert that the limitations on the jurisdiction of the federal courts to hear citizen suits were included to ensure that agency efforts were not hampered by "unrestricted private enforcement activity." Memorandum of Law in Support of Motions of Defendant ICC for Dismissal of the Complaint and for Summary Judgment at 11. They cite the concern expressed during Congressional consideration of the 1970 amendments to the Clean Air Act that the citizen suit provisions might be used to bring "frivolous and harassing actions." S.Rep.No.1196, *supra* at 18, in Legislative History, *supra* at 438. Furthermore, they contend that "[t]he plaintiffs are attempting to intrude upon the enforcement program which has been developed by the New York Department of Environmental Conservation." Memorandum of Law at 12. Agency enforcement policy, when it is reasonable in light of the difficulties posed by a given set of circumstances, should be protected from disruption by private efforts. One could argue in this case, for example, that DEC performed reasonably well. With limited resources at its disposal, DEC rapidly obtained an Order of Consent, and then carefully built a case for

enforcement. DEC's efforts appear to have forced ICC to spend considerable amounts to improve an outdated cement plant. More vigorous enforcement might have succeeded only in forcing the plant to close even sooner than it did.

Defendants' perception of the citizen suit as interfering with agency efforts is inconsistent, however, with the spirit in which such suits were authorized by Congress and with which they have been received by the Second Circuit. "In enacting § 304 of the 1970 Amendment, Congress made clear that citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests .... Thus the Act seeks to encourage citizen participation rather than to treat it as a curiosity or theoretical remedy." *Friends of Earth v. Carey*, 535 F.2d 165, 172 (2d Cir. 1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). *See also Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 700 (D.C.Cir.1974). Of course, "unrestricted" citizen suits would be undesirable. But Congress has clearly indicated that such suits must be accepted where agency enforcement activity is insufficient.

Indeed, the legislative history suggests that citizen suits should be dismissed only if the District Court finds the state agency's conduct adequate to justify that extreme remedy:

It should be emphasized that if the agency had not initiated abatement proceedings following notice or if the citizen believed efforts initiated by the agency to be inadequate, the citizen might choose to file the action. *In such case, the courts would be expected to consider the petition against the background of the agency action and could determine that such action would be adequate to justify suspension, dismissal, or consolidation of the citizen petition.* On the other hand, if the court viewed the agency action as inadequate, it would have jurisdiction to consider the citizen action notwithstanding any pending agency action.

S.Rep.No.1196, *supra* at 37, in Legislative History, *supra* at 437 (emphasis added). In short, the legislative history suggests a sensitive handling of citizen suits, that reflects Congress' conviction that such suits can perform an indispensable function.

Nothing in the record supports the view that this particular case is frivolous, or that plaintiffs' federal claim for injunctive relief was brought to harass defendants. The evidence is strong that ICC operated the cement plant in continuous and substantial violation of air quality standards. Defendants may prove the contrary. But DEC and EPA shared plaintiffs' view that violations were taking place.

Anyone familiar with the complexities and costs often involved in securing enforcement of environmental goals will recognize the appeal of defendants' argument against permitting citizens to disrupt the enforcement efforts of state and local agencies. Nevertheless, the line Congress appears to have drawn in the Clean Air Act has much to commend it. Complete deference to agency enforcement strategy, adopted and implemented internally and beyond public control, requires a degree of faith in bureaucratic energy and effectiveness that would be alien to common experience. At minimum, by requiring that a "civil action" to abate violations be commenced and diligently prosecuted, Congress mandated that a relatively formal injunctive proceeding of some kind be commenced and pursued if no effective settlement is obtained. Any such proceeding, such as an enforcement action at DEC, would tend to assure Congress, the courts, and the public that agency enforcement efforts were real and sufficient.

In this case, for example, an administrative enforcement action would have required the Commissioner of DEC to designate a hearing officer, who would possess substantial independence of judgment and action. DEC would have had to assign sufficient personnel to prepare the case against ICC, and to meet deadlines set by the hearing officer. Citizens and environmental groups would have been free to attend the proceeding, and more significantly to intervene and participate as parties. Settlements would still have been possible, but the adequacy of any proposed settlement would be considered by the hearing officer, and intervenors would be given at least an opportunity to comment. *See generally, In re General Electric Co.*, 6 Env. L.Rep. 30,001, 30,007, 30,023 (DEC–ALJ, 1975–76). Had no settlement been achieved, findings and conclusions would have accompanied the hearing officer's recommendation to the Commissioner. The Commissioner's determination would have been appealable, not only by the respondent, but also by citizens or intervenors. In short, at every point in the proceeding a record of the agency's diligence would be available to interested citizens and the courts.

To contend that citizen suits undermine agency enforcement policy is, moreover, ultimately misleading. Unquestionably, such suits may disturb the course of agency action. But the agency nevertheless remains free to adhere to its own view of the appropriate enforcement policy by continuing to press for an informal resolution and devoting its enforcement resources to other matters. This should hardly be viewed as some sort of deprivation for the agency, since it will usually result from the agency's own determination that the steps necessary to retain enforcement control are not worth the resources required. In this case, once ICC failed to comply with the 1978 Order on Consent, DEC had the choice of either commencing an enforcement proceeding and prosecuting it diligently, or permitting the citizen suit to go forward. It could not follow a different enforcement policy and still satisfy the statutory standard.

The motions to dismiss as moot and for lack of jurisdiction are denied. Defendants should make any other preliminary motions within thirty days of this order. Meanwhile, discovery should proceed.

SO ORDERED.