In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1103

FRIENDS OF MILWAUKEE'S RIVERS AND
ALLIANCE FOR THE GREAT LAKES,

*Plaintiffs-Appellants*,

*v.*

MILWAUKEE METROPOLITAN SEWERAGE DISTRICT,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02-C-0270—**Charles N. Clevert, Jr.**, *Judge*.

ARGUED SEPTEMBER 9, 2008—DECIDED FEBRUARY 13, 2009

Before BAUER, CUDAHY, and WOOD, *Circuit Judges*.

CUDAHY, *Circuit Judge*.

## I. Background

This case has a long and stormy history. Its full back-
ground was set out in this court's previous opinion,

*Friends of Milwaukee's Rivers and Lake Michigan Fed'n v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743 (7th Cir. 2004) (*FMR I*). After over six years of litigation and two trips back and forth between the district court and this court, we are hopeful that the sun is breaking through.

For the ease of the reader, a brief review of the facts and procedural history is provided below.

## A. The Initial Proceedings in the District Court

Friends of Milwaukee's Rivers and Lake Michigan Federation, n/k/a Alliance for the Great Lakes (collectively, Friends), filed this citizens' suit against the Milwaukee Metropolitan Sewerage District (MMSD) under the Federal Water Pollution Control Act (the Clean Water Act or the Act), 33 U.S.C. §§ 1251 *et seq.*, in the United States District Court for the Eastern District of Wisconsin on March 15, 2002. Friends alleged that certain sanitary sewer overflows that occurred between January 1, 1995 and September 25, 2001 were violations of MMSD's Clean Water Act permit and of the Act itself. They sought a declaratory judgment, injunctive relief, civil penalties and costs and fees under the citizens' suit provision of the Act. *FMR I*, 382 F.3d at 751. Later that same day, the State of Wisconsin (the State) also filed suit against MMSD.

Within a few months, the State and MMSD reached a settlement (the 2002 Stipulation), which provided for expenditures of more than $900 million on various projects. MMSD agreed to (1) build new Deep Tunnel projects that increase wastewater storage capacity from 405 to 521

million gallons; (2) upgrade its information and control technology, including the installation of a Real Time Control system; (3) reduce infiltration and inflow of storm water into the system by five per cent; and (4) complete a number of other projects, including a Capacity Management, Operation and Maintenance Program as well as projects provided for in its long-term facilities plan.

MMSD then moved to dismiss Friends' citizens' suit. The district court found that the State had commenced and diligently prosecuted judicial and administrative enforcement actions against MMSD. Therefore, it dismissed Friends' suit as barred first by the Act and in the alternative by *res judicata.* Friends appealed.

### B. *FMR I*

In *FMR I*, we undertook a comprehensive review of MMSD's background, systemic difficulties and ongoing litigation with the State and with Friends. 382 F.3d at 748-51. We also recognized the occurrence of a massive, unprecedented dumping in May 2004 of 4.6 billion gallons of rainwater laced with raw sewage—including a sanitary sewer overflow (SSO) of about 500 million gallons—directly into Lake Michigan and Milwaukee-area rivers. *Id.* at 749 n.1.

We found, first, that the Clean Water Act did not bar Friends' suit. The Act strips the courts of subject matter jurisdiction over citizens' suits where the State has timely commenced judicial or administrative enforcement actions. *See* 33 U.S.C. §§ 1365(b)(1)(B), 1319(g). Because

the State's actions in this case were not commenced before Friends filed their citizens' suit, we held that these provisions did not apply. 382 F.3d at 757. That holding is not at issue in this appeal.

Second, with respect to *res judicata*, we agreed that two out of its three requirements had been satisfied: there had been prior litigation resulting in a final judgment on the merits by a court with jurisdiction, and there was identity of the causes of action in the two suits. *FMR I*, 382 F.3d at 757-58. We found, however, that the record was insufficient to determine whether Friends were in privity with the State for purposes of the two actions.

We explained, "in order for the state agency to be in privity with the public's interests, the State's subsequently-filed government action must be a diligent prosecution." *FMR I*, 382 F.3d at 759. Looking to the language of the Act to define "diligent prosecution," we said, "[o]ur diligent prosecution analysis of the 2002 Stipulation will examine whether it is capable of requiring compliance with the Act and is in good faith calculated to do so." *Id.* at 760. We recognized "that diligence on the part of the State is presumed," *id.*, and neither perfect foresight nor success are required. *Id.* at 759. Notwithstanding those points, however, "a diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator with whom it settled regarding their intent with respect to the effect of the settlement." *Id.* at 760. Therefore, we engaged in a substantive analysis of whether the 2002 Stipulation was capable of

requiring compliance with the Act and was in good faith calculated to do so.

Most of the concerns that Friends raised about the diligence of the 2002 Stipulation were easily dispensed with, but we shared their concern that "the planned improvements to MMSD's system under the 2002 Stipulation may not in fact result in MMSD's eventual compliance with the Act and its permit." *Id*. at 763. We did not "feel confident that the 2002 Stipulation will indeed result in elimination of the root causes underlying the large-scale violations alleged by the plaintiffs, regardless of the State's and MMSD's self-serving statements that it is intended to do so." *Id*. at 764. Therefore, we could not say on the basis of the record as it existed before the district court whether the 2002 Stipulation was calculated to result in compliance with the Act and remanded for determination of that issue. *Id*. at 765. Our specific instructions were the following:

> [T]he district court should determine whether the systemic inadequacies of MMSD's sewerage facilities will be sufficiently ameliorated by the proposed remedial projects to result in compliance. If the district court concludes, after giving some deference to the judgment of the State, that there is a realistic prospect that violations due to the same underlying causes purportedly addressed by the 2002 Stipulation will continue after the planned improvements are completed, the plaintiffs' suit may proceed. If, after a more detailed examination of the 2002 Stipulation, the district court concludes that no such prospect exists, it may so find, provide a thorough

explanation of its conclusion and consider reinvoca-
tion of the *res judicata* bar.

*Id*. at 765.

### C.  The District Court's Opinion on Remand

The district court held a two-day evidentiary hearing
and ordered post-hearing briefing to address whether
the 2002 Stipulation was capable of achieving, and calcu-
lated to achieve, compliance with the Act and was there-
fore a diligent prosecution for privity purposes.

The court began by defining compliance with the Act
as compliance with the permit MMSD had with the State
at the time, citing 33 U.S.C. §§ 1311(a), 1346(a)-(b). That
was the 1997 Wisconsin Pollutant Discharge Elimina-
tion System (WPDES) permit, which prohibited SSOs
subject to certain "exceptions to enforcement," including
unavoidable bypasses "necessary to prevent loss of life or
severe property damage." *Friends of Milwaukee's Rivers
and Lake Michigan Fed'n v. Milwaukee Metro. Sewerage Dist*.,
No. 02-C-0270, 2007 WL 4410402, at *4 (E.D. Wis. Dec. 14,
2007). The court then noted that the capacity and
physical infrastructure of the sewer system is in turn
determined by the State, including the Wisconsin Depart-
ment of Natural Resources (WDNR), in cooperation
with MMSD. Therefore, the court reasoned, if the capacity
of the system as determined by WDNR was insufficient
to handle the flow of a storm and an SSO was necessary
to prevent severe property damage, that would not neces-
sarily be a violation of the permit.

The court recognized the hard work that had been done by the State and MMSD to determine what the capacity and infrastructure of the system should be. That work was incorporated into MMSD's 2010 Facilities Plan and the 2002 Stipulation. Additionally, the WDNR's 2001 Report, *Sewer Overflows in Wisconsin—A Report to the Natural Resources Board*, was considered in the negotiations for the 2002 Stipulation. Ultimately, the court said that the 2002 Stipulation "reflects the judgment of the defendant and the WDNR that flows greater than those expected on a five-year recurrence interval are so infrequent that construction of additional infrastructure is unwarranted from a cost-benefit perspective." 2007 WL 4410402, at *6. It said, "the Stipulation, which references the WPDES permit and the 2010 Plan design standard, provides the benchmark for compliance in this case." *Id*.

The court heard testimony from both parties' experts regarding whether the projects required by the 2010 Plan and the 2002 Stipulation would bring MMSD into compliance with its 1997 permit. MMSD's expert, James T. Smullen, had over thirty years of experience managing large overflow reduction projects and using hydraulic modeling. *Id*. at *7. He concluded that the improvements would be "more than adequate to stop the sanitary sewer overflows that have been targeted in the system." *Id*. at *8. That is, the capacity increases that would result from the 2002 Stipulation's projects would be more than enough to capture SSOs for the five-year recurrence interval and smaller. *Id*.

Plaintiffs' expert, Dr. Bruce A. Bell, disagreed, and opined that the added capacity would not be sufficient to achieve compliance with the 1997 permit. The court found, however, that Dr. Bell's analysis did not address several key facts, such as the 2002 Stipulation's requirement for a Real Time Control System and the most recent hydraulic modeling data. *Id.* at *8. It therefore declined to rely on his opinions.

The court also had before it testimony from WDNR employees, including Charles G. Burney, who admitted that in 2002 WDNR believed that the Stipulation would result in MMSD's compliance with the WPDES permit. *Id.* at *9. After the May 2004 overflows, however, Burney changed his mind. At the district court's evidentiary hearing, Burney testified that he believed that some of the overflows, including the 500 million gallon May 2004 SSO, would not have been prevented by the increased capacity and other improvements required by the 2002 Stipulation. *Id.* at *10. He also did not feel that the severity of the storms was a sufficient justification for the overflows. *Id.*

The court did not find Burney's testimony on this point reliable or persuasive because Burney had not done any mathematical modeling with respect to how the system responded to the storms, accounted for the impact of several of the 2002 Stipulation's projects that had not yet been completed in May 2004 or considered the fact that not all of the deep tunnel's pumps were working at the time of the storms. *Id.*

The record before the district court showed that the May 2004 storms were in fact in excess of the five-year design

storm. *Id*. Nevertheless, the court said, "MMSD's modeling suggests that the SSOs would have been prevented by the improvements required by the Stipulation." *Id*. Finally, the court did not find relevant the fact that the WDNR and WDOJ had initiated an additional enforcement action against MMSD (the 2005 enforcement action). *Id*. at *11.

After the hearing, Friends supplemented the record with evidence of two SSOs that occurred in the spring of 2006: a 570,000 gallon SSO on March 13, 2006, and a 346,000 gallon SSO on April 3, 2006. Friends also sought to introduce a letter from Jo Lynn Traub of the United States Environmental Protection Agency (EPA) to Amy Smith of the WDNR. The court rejected this letter as hearsay that did not qualify for the public records exception under Fed. R. Evid. 803(8). Additionally, the court said, "Even if [the letter] fell within Rule 803(8), it is not sufficiently reliable or trustworthy to overcome the rule against admission of hearsay evidence." District Court Order, Appellant's Short Appendix at App. 022. The plaintiffs also sought to introduce the summons and complaint filed in the 2005 enforcement action by the WDOJ for proof of the matters alleged in it. The court rejected that as hearsay as well, but admitted the documents for the limited purpose of proving that the State had filed suit. *Id*. at App. 023-24.

On May 19, 2008, the WDOJ and MMSD resolved the WDOJ's 2005 enforcement action with a new stipulation (the 2008 Stipulation). The 2008 Stipulation said, among other things, that

MMSD has accomplished much of the work required under the terms of the 2002 Stipulation; has maintained compliance with the terms of the 2002 Stipulation, including completion of projects in accord with the schedule; and has achieved reductions in the frequency and volume of wet weather sanitary sewer overflows ("SSOs") and combined sewer overflows ("CSOs") from its system as a result of the improvements made under the 2002 Stipulation;

. . .

The parties believe and acknowledge that implementation of the other requirements of the 2002 Stipulation will result in the realistic prospect of an end to alleged discharge permit violations due to the underlying causes addressed by the 2002 Stipulation;

. . .

[O]n the basis of its review of MMSD's progress under the 2002 Stipulation as described below, the State now believes that because of the steps taken and planned by MMSD pursuant to the 2002 Stipulation there is no realistic prospect that future permit violations due to the same underlying causes addressed by the 2002 Stipulation will continue after the planned improvements are completed. . . .

Stipulation and Order for Judgment at 1-3.

The district court found that the 2002 Stipulation was a diligent prosecution for privity purposes, and therefore dismissed plaintiffs' suit on *res judicata* grounds. Plaintiffs

appealed the dismissal as well as the denial of their motions to supplement the record.

## II. Discussion

The questions presented in this successive appeal are relatively narrow. Friends do not challenge the sufficiency of the evidence supporting the district court's decision. Instead, they contend that the district court violated our mandate by not "considering and giving due weight to: post-stipulation violations of the Act; a post-stipulation determination by WDNR, with which the United States EPA concurred, that the 2002 Stipulation would not bring MMSD into compliance with the Act; and a post-stipulation enforcement action initiated by the [WDOJ] against MMSD[.]" Appellant's Br. at 2. They argue that "had the district court considered these post-stipulation events, it would have had no choice but to find that the 2002 Stipulation did not and does not constitute diligent prosecution by WDNR." *Id.* at 12. Additionally, Friends contend that the district court erred by refusing to admit and consider the letter from the EPA to the WDNR. For the following reasons, we find that Friends' arguments, although entitled to weight, are not a sufficient basis for reversing the district court.[1]

---

[1] The district court had federal question jurisdiction pursuant to 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291 because the district court entered a final judgment dismissing this case due to *res judicata*.

### A. Standard of Review

Typically, a district court's dismissal of a case on *res judicata* grounds is reviewed de novo, *Cole v. Board of Trustees of University of Illinois*, 497 F.3d 770, 772 (7th Cir. 2007); but this is not a typical case. We instructed the district court to make findings of fact regarding whether the State's prosecution of MMSD's violations of the Act was diligent and to apply the law as we defined it to those facts. To do so, the court held an evidentiary hearing, in which it was necessary, among other things, to assess the credibility of witnesses. Therefore, the clear error standard of review is appropriate here. *Trustees of Chicago Painters and Decorators Funds v. Royal Int'l Drywall and Decorating, Inc.*, 493 F.3d 782, 785 (7th Cir. 2007) ("In an appeal from a bench trial, '[w]e review a district court's conclusions of law de novo, and we review its findings of fact, as well as applications of law to those findings of fact, for clear error.'") (quoting *Keach v. United States Trust Co.*, 419 F.3d 626, 634 (7th Cir. 2005)); *accord Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008); *Levenstein v. Salafsky*, 414 F.3d 767, 773 (7th Cir. 2005).

### B. Relevance of Post-stipulation Evidence

This case finds itself in a unique procedural posture after our remand in *FMR I*, the district court's decision re-invoking *res judicata* and now this successive appeal. Precedent is correspondingly sparse; neither the parties nor the court have discovered any cases specifically

addressing the question presented by Friends regarding the admissibility and weight of post-stipulation evidence to the question of privity and diligent prosecution. Some lower courts have considered such evidence. *See, e.g.*, *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, L.L.C.*, 500 F. Supp. 2d 592, 605-08 (E.D. La. 2007) (considering post-consent decree events as additional support for the court's finding that the consent decree was the result of diligent prosecution); *Gardeski v. Colonial Sand & Stone Co., Inc.*, 501 F. Supp. 1159, 1166 (S.D.N.Y. 1980). Those cases did so, however, without squarely addressing the question whether their consideration of that evidence was proper. Our general comments in *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992), regarding the propriety of follow-up inquiries into diligence are not controlling because of the distinct procedural posture of the present case.[2]

Putting the question of post-stipulation evidence aside for a moment, we note first that the central evidence bearing on the diligence of a representative's prosecution in a case like this one is presumably pre-stipulation evidence. "[T]he focus of the diligent prosecution inquiry should be on whether the actions are calculated to eliminate the cause(s) of the violations." *FMR I*, 382 F.3d at 760. Whether an agreement or judgment is capable of and in good faith calculated to achieve compliance with

---

[2]  As noted by the EPA, it is only due to the unique procedural posture of this case that enough time has passed for significant post-stipulation events to occur.

the law can usually be (and in most cases should be) determined as of the time it is executed, based on the facts then available to the parties. This approach makes sense, because the question is essentially asking if the state faithfully discharged its responsibilities to its constituents and achieved what it reasonably believed to be a solution to the problem. It is also supported by the comments to the Restatement of Judgments:

> The failure of a representative to invoke all possible legal theories or to develop all possible resources of proof does not make his representation legally ineffective, any more than such circumstances overcome the binding effect of a judgment on a party himself . . . . Whether the representation has been inadequate is a question of fact to be decided in light of the issues presented in the case and the factual and legal contentions that might reasonably have been expected to be presented.

Restatement (Second) of Judgments § 42 cmt. f (1982). Moreover, as we noted in *FMR I*, "diligence does not require a state agency to have perfect foresight," and the State is not required to succeed; it is required only to try, diligently. 382 F.3d at 759 (citing *Supporters*, 973 F.3d at 1324). We recognized the possibility that additional problems, even ones existing before the 2002 Stipulation was entered, might manifest themselves after the Stipulation without instantly becoming proof of a lack of diligence. *Id*. at 762. In sum, when the evidence in a case like this one demonstrates that a citizens' representative acted in good faith and obtained relief adequate to address all known problems in the system and to pre-

vent all foreseeable violations, that constitutes diligent prosecution, no matter what happens later. Therefore, Friends' suggestion that pre-2002 Stipulation evidence is irrelevant to the determination of diligent prosecution is misguided. Appellant's Br. at 16 ("Speculating as to what the parties intended or thought the 2002 Stipulation would do was pointless.").

As a general matter, consideration of post-stipulation evidence raises a number of practical objections. For example, *res judicata* is an issue that should be immediately and finally determinable by the courts. If post-stipulation evidence is relevant to the determination, citizens' suits might go on indefinitely as long as any problems remain in the system or the government continues with its oversight and enforcement responsibilities. As noted by the EPA, "[b]ecause there is always the possibility of new . . . evidence, that approach would make it extremely difficult to achieve finality as to a [*FMR I*] 'diligent prosecution' determination." EPA Br. as Amicus Curiae at 17 n.4. Friends responds to this argument by arguing that in this case, the *res judicata* issue has not yet been authoritatively decided, and once it is, it will become "unassailable and not vulnerable to subsequent challenges by a plaintiff who has become subject to the res judicata bar." Reply at 11. As pointed out by the EPA, however, this argument may ignore the potential applicability of procedural mechanisms such as Federal Rule of Civil Procedure 60(b).[3]

---

[3] We do not hereby suggest that it would be appropriate to

(continued...)

Second, as is becoming increasingly clear in this case, it may be difficult for the district courts to determine the relevance and impact of post-stipulation evidence. The courts may have to determine whether the new evidence is proof that the stipulation is not diligent or instead merely proof that the changes called for by the stipulation have not yet been implemented, or that there are new problems. Additionally, it may be a difficult task for the district court to attempt to focus only on the appropriate remedy for the violations as they existed years ago, instead of fashioning a remedy to address the situation as it is currently developing.

A third point, related to the second, is the possible interference with other government enforcement actions that consideration of post-stipulation evidence might cause. This point was argued forcefully by the EPA in its amicus brief. It applies particularly to examination of pleadings made in other actions or current opinions of government officials. Similarly, allowing reopening of previously barred actions based on recently developed evidence could potentially thwart the ability of the state to settle cases by undermining the confidence of opposing parties in the binding nature of a settlement. Finally, it is arguable that allowing consideration of post-stipulation evidence in earlier-filed actions could create a kind of loophole in the Act's procedural requirements for

---

[3] (...continued)
apply Rule 60(b) in these circumstances, or that district courts should exercise their discretion to do so, but only note that it is possible that plaintiffs would attempt to invoke it.

citizen suits by allowing consideration of later violations that are not the subject of a properly filed citizens' suit.

Despite these pitfalls, we reject the position that post-stipulation evidence is wholly irrelevant or should generally be found to be such. The concept of relevance is broad and excluding all post-stipulation evidence would be inconsistent with its reach. After all, the proof of the pudding is in the eating. Post-stipulation evidence is sometimes directly probative of the adequacy of a stipulation and the diligence of a prosecution. It may provide a valuable epilogue: objective evidence of what actually happened. This is supported by some of the language we used in *FMR I*: for example, we instructed the district court to consider whether the 2002 Stipulation was "capable" of ending violations and whether it had a "realistic" prospect of doing so. 382 F.3d at 760, 765.

It would be difficult to provide guidance regarding all conceivable types of post-stipulation evidence and we will not attempt to do so. Its probative weight and, in clear cases, even its admissibility, will depend on the particular circumstances of each case and the district courts should have broad discretion to determine what weight to afford it, or, if clearly appropriate, to exclude it. In general, the difficulties that attend it must be dealt with as best they can in the interest of full evidentiary disclosure. We do not encourage the district courts to shut their eyes to the obvious, or even to the plausible. With all of that background, we now turn to Friends' arguments that the district court in this case erred by

refusing to give their post-stipulation evidence con-
clusive deference.

### 1. Post-stipulation SSOs

Friends' main argument is that the district court failed to
consider or give enough weight to the post-stipulation
evidence they offered. First, they point to the SSOs in
2004 and 2006 and say, "[t]he best evidence of whether
the 2002 Stipulation would result in compliance with the
Act are the SSOs that continued to occur . . . ." Appellant's
Br. at 16. The May 2004 SSO was indeed a massive event,
as we noted in *FMR I*. 382 F.3d at 749 n.1. But there are
many reasons why the occurrence of a post-stipulation
SSO, without more, is not necessarily conclusive proof
of a lack of diligence.

First, the improvements called for in the 2002 Stipula-
tion should be understood by all parties to take time to
implement. Many projects will take years to complete. It
is to be expected that SSOs due to the same causes ad-
dressed by the 2002 Stipulation would continue to occur
for a time before the Stipulation's projects are complete.
Second, as discussed above, the district court found that
under the 1997 WPDES permit, an SSO caused by a storm
that was bigger than the system was designed to handle
would not necessarily put MMSD in violation of the
permit. An SSO resulting from an exceptionally large
storm would therefore not conclusively prove that the
2002 Stipulation was not capable of complying, and

calculated to comply, with the permit.[4] Finally, an SSO resulting from independent causes, such as, for example, a broken pump, would also not lead to the conclusion that the 2002 Stipulation was not a diligent prosecution.

For these reasons, as well as the practical difficulties of considering post-stipulation evidence in general, the burden to lay a proper foundation for evidence of post-stipulation SSOs, and to establish that significant weight should be accorded such evidence, must be placed on the proponent of the evidence. To demonstrate a significant evidentiary weight, that party must show that the SSO (1) resulted from the same underlying causes as were addressed by the 2002 Stipulation; (2) was a violation of the applicable permit; (3) would not have been prevented by the stipulation's projects, if those projects had been completed; and (4) that the proffered evidence satisfies all other generally applicable evidentiary requirements. This approach is consistent with *FMR I*, where we said, "[i]f the district court concludes, after giving some deference to the judgment of the State, that there is a realistic prospect that violations due to the same underlying causes purportedly addressed by the 2002

---

[4] The parties disagree regarding whether the 2003 permit treats such SSOs similarly to the way the 1997 permit treated them. Because drafting had not even begun for the 2003 permit by the time the 2002 Stipulation was entered, *see* Transcript of Hearing of August 24, 2005, at 227, it is irrelevant to this appeal. Additionally, any argument that the district court improperly interpreted the 1997 permit has been forfeited.

Stipulation will continue after the planned improvements are completed, the plaintiffs' suit may proceed." 382 F.3d at 765. Further, MMSD conceded at oral argument that if Friends were able to make this required showing, its position on the relevance of post-stipulation SSOs might be different—and the evidence might be relevant. As to admissibility, in contrast to weight, as we have indicated, we think a clear showing should be required to support exclusion.

Contrary to Friends' contention, the district court did consider the post-stipulation SSOs. It found, in reliance on evidence from the Southeast Wisconsin Regional Planning Commission (SEWRPC), that the May 2004 storms were in excess of the five-year design storm (and therefore that the SSOs would not have constituted violations of the permit). 2007 WL 4410402, at *10. Additionally, the court recognized that MMSD's modeling showed that the May 2004 SSO would have been prevented by the improvements required by the 2002 Stipulation. *Id*. This modeling is explained in detail in MMSD's briefing. *See* Appellee's Br. at 21-24 (also citing to an audit report prepared for Milwaukee Mayor Tom Barrett that supports MMSD's conclusion). The district court appears to have found MMSD's evidence persuasive, and it is not our function to re-weigh the evidence.

In contrast, Friends offered no evidence, other than the opinion of Mr. Burney (discussed below),[5] much less any hydraulic modeling or other quantitative evidence, in

---

[5] Burney characterized the conclusions of the SEWRPC report as "fairly bogus." Reply at 9.

support of their argument that the post-stipulation SSOs were proof that the 2002 Stipulation was not diligent. They also did not attempt to rebut MMSD's showing that the May 2004 SSO would have been contained had the 2002 Stipulation projects been completed. Therefore, Friends did not fulfill their burden to show that those SSOs were of decisive weight, even if properly admissible. In the case before us, the district court did not abuse its discretion by considering the post-stipulation SSOs, and having considered them, it was not clearly erroneous for the court to decline to give them decisive weight. As we have indicated, it is not our role to perform this analysis again.

### 2. The State's post-stipulation opinions

Friends' second main point is that the district court should have disregarded MMSD's modeling evidence, the SEWPRC report and the fact that one of the pumps was not working, and instead deferred to Burney's opinion and the fact of the initiation of the 2005 enforcement action.

Burney said that the overflows that occurred in late May of 2004 "were beyond what would have been controlled by the projects contained in the 2002 Stipulation." Transcript of Hearing of August 24, 2005, at 205. The district court declined to give conclusive weight to Burney's testimony because, it said,

> Burney admitted that he did not do any mathematical modeling to determine how the system responded to the storm. He further admitted that the capacity expansions had not been built as of May 2004; that

many other provisions of the Stipulation had dead-
lines beyond May of 2004; that he had not analyzed
the amount of flow that would have been reduced
by the [inflow and infiltration] projects included in
the Stipulation; that he had not analyzed the impact
of the CMOM program called for in the Stipulation;
and that he had not analyzed how the inoperability of
one deep tunnel pump affected flow at the time of
the 2004 storm.

2007 WL 4410402, at *10.

We did instruct the district court to "give some deference
to the judgment of the State." *FMR I*, 382 F.3d at 765. We
did not, however, instruct it to give conclusive deference
to the judgment of one state official without regard to
other evidence. In fact, we instructed the court to engage
in a detailed analysis of the 2002 Stipulation and not to
take the parties' statements at face value. *Id.* at 760, 765.
The district court's assessment of the reliability of Mr.
Burney's testimony was therefore not clearly erroneous.

It was also not clearly erroneous for the district court to
hold that the fact that the State initiated a new enforce-
ment action did not prove a lack of diligence with respect
to the 2002 Stipulation. The district court noted our state-
ment in *FMR I* that "[i]f any additional operational or
management problems have become evident since the
2002 Stipulation, the State and MMSD are entitled by the
Act to an opportunity to resolve them before the plain-
tiffs may jump into the fray." 382 F.3d at 762. The fact
that a new enforcement action has been initiated does
not logically compel the conclusion that the 2002 Stipula-

tion was not diligent, or even that the State held the belief that it was not.[6]

Moreover, Friends' argument that we should give conclusive deference to the opinion of the State would now require that we defer to its recent statements in the 2008 Stipulation, which resolved the 2005 enforcement action. Those statements include the following: "the State now believes that because of the steps taken and planned by MMSD pursuant to the 2002 Stipulation there is no realistic prospect that future permit violations due to the same underlying causes addressed by the 2002 Stipulation will continue after the planned improvements are completed." Stipulation and Order for Judgment at 3. This formulation appears to deliberately track our language in *FMR I*. 382 F.3d at 765.

When asked at oral argument why the 2008 Stipulation does not eviscerate their argument, Friends cited to *Board of Trustees of Knox County Hosp. v. Shalala*, 135 F.3d 493 (7th Cir. 1998), for the proposition that "[a]s a general matter, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views." *Id*. at 502 (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698 (1991)). Curiously, Friends fail to recognize that this proposition would also apply to Burney's earlier opinions, weakening them as much as it might weaken the 2008 Stipulation. Regardless,

---

[6] Friends do not appeal the district court's decision admitting the summons and complaint for the sole purpose of showing that a new enforcement action had been initiated.

we see the 2008 Stipulation as further support for the district court's not unreasonable determination that Burney's opinions were unsupported and not due conclusive deference.[7]

## C. Evidentiary Rulings

Friends have repeatedly faulted the district court for failing to consider a purported conclusion by the EPA that the 2002 Stipulation would not ensure compliance with the Act. They do so again here. The statements at issue are found in a November 3, 2004 letter from Jo Lynn Traub of the United States EPA to Amy Smith of the WDNR, in which Traub was following up on a meeting between the two organizations on August 13, 2004. Friends seize on the words used by Traub and argue that they show that "EPA concluded that the 2002 Stipulation would not result in compliance with the Act, [but] the District Court . . . refused to allow that conclusion into evidence." Appellant's Br. at 20. It seems that the language that Friends are focusing on is the following, taken from the last page of the letter:

> The 2002 Stipulation with MMSD focused largely on reducing impacts of SSOs through increasing storage

---

[7] Friends also argue that the 2008 Stipulation is undermined by statements made by the EPA in letters that Friends submitted to this court. This argument is not persuasive because the EPA's statements do not relate to the mandate of the district court or to the questions presented to this court.

capacity in the tunnel system. At our meeting, you indicated that had all the additional controls required by the stipulation been completed, the May 2004 overflow events would still have occurred. We recommend that MMSD be required both to take a more active role in monitoring and controlling the volumes of flow entering their system from the satellites, and to implement CMOM in their separated collection system earlier than scheduled in the stipulation. . . .

Appellant's Separate Appendix at 117.

Friends moved to admit this letter into evidence twice during the district court's evidentiary hearing and the district court denied the motions. They then moved the court to reconsider that ruling, arguing that the letter is admissible as a public record under Federal Rule of Evidence 803(8)(A) as setting forth the "activities" of the EPA.[8] The district court denied that motion as well,

---

[8] This hearsay exception provides,

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . .

> (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and
> (continued...)

holding that the letter did not qualify as a public record under the hearsay exception in Rule 803(8), and that "[e]ven if Exhibit 26 fell within Rule 803(8), it is not sufficiently reliable or trustworthy to overcome the rule against admission of hearsay evidence." District Court Order, Appellant's Short Appendix at App. 020-22.

"We . . . review the district court's evidentiary rulings only for abuse of discretion, and we 'will not reverse unless the record contains no evidence upon which the trial judge rationally could have based his decision.'" *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1175-76 (7th Cir. 2008) (quoting *United States v. Savage*, 505 F.3d 754, 760 (7th Cir. 2007)). The district court had a reasonable basis for excluding this letter as failing to satisfy the requirements of Rule 803(8). It does not appear to support Friends' assertion that it shows that EPA had concluded that the 2002 Stipulation would not bring MMSD into compliance with the Act or that EPA agreed with WDNR's conclusion. This was confirmed at oral argument by counsel for the EPA, who said that the Traub letter was only repeating the opinion of the WDNR and not stating an opinion of the EPA. Therefore, the

---

[8] (...continued)

proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8).

district court was within its discretion when it found that the letter did not set forth the activities of the EPA. Moreover, even if any abuse of discretion had occurred, it would have been harmless.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.