[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13651

_____

SOUTH RIVER WATERSHED ALLIANCE, INC.,
JACQUELINE ECHOLS,

Plaintiffs-Appellants,

*versus*

DEKALB COUNTY, GEORGIA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-04299-SDG

_____

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

BRANCH, Circuit Judge:

In 2010, the United States Environmental Protection Agency ("EPA") and Georgia Department of Natural Resources ("GDNR") sued DeKalb County for violating the Clean Water Act ("CWA"). To resolve this suit, the parties agreed to—and the court entered—a consent decree in 2011. Eight years later, South River Watershed Alliance, Inc. ("South River") and Jacqueline Echols sued DeKalb County for failing to follow the decree and violating the CWA.

The CWA authorizes citizen suits for enforcement purposes, but such suits are not allowed when an "[a]dministrator or State has commenced and is *diligently prosecuting* a civil or criminal action . . . to require compliance with the standard, limitation, or order[.]" 33 U.S.C. § 1365(b)(1)(B) (emphasis added). Thus, this case turns on whether the 2011 consent decree—along with the ongoing efforts of the EPA and GDNR to require compliance—constitutes diligent prosecution. If so, South River's suit is barred; if not, South River's suit is good to go.

The district court determined that South River's suit was barred by the diligent prosecution bar. On appeal, South River argues for the opposite result and requests injunctive relief to ensure DeKalb County's compliance. After careful consideration, and with the benefit of oral argument, we agree with the district court that South River's suit is barred by § 1365(b)(1)(B).

## I.    Background

South River is "a non-profit membership organization" that advocates "to protect and restore the water quality and biodiversity" of the South River and Chattahoochee River watersheds.  Co-plaintiff Echols is a South River member who enjoys these watersheds for their "aesthetic, recreational, ecological, and biological values."

DeKalb County owns and operates a wastewater collection and transmission system.  According to its National Pollutant Discharge Elimination System ("NPDES") permits, DeKalb County is required to collect, transport, and treat wastewater before discharging it into surface waters.  South River—despite the presence of a consent decree from an earlier government action against DeKalb County for its CWA violations—sued DeKalb County for violating the CWA by repeatedly spilling wastewater, including untreated sewage, into surface waters.

### A.  2010 Litigation and Consent Decree

In December 2010, the EPA and GDNR filed a complaint against DeKalb County alleging that, since 2006, DeKalb County had spilled untreated wastewater—in what are called "sanitary sewer overflows"—on hundreds of occasions.  Many of these overflows resulted in the discharge of untreated sewage into the South River and Chattahoochee watersheds.  In May 2011, the

district court allowed South River to intervene in the government action.[1]

Over South River's objections, in December 2011, the district court approved a consent decree executed by DeKalb County, the United States, and the State of Georgia. *United States v. DeKalb Cnty., Ga.*, No. 1:10-cv-4039-WSD, 2011 WL 6402203

---

[1] DeKalb County argues that South River is barred by res judicata from asserting its claims in the instant appeal because South River properly intervened in the 2010 litigation and South River could have raised the present issues in the prior litigation. "Under res judicata, also known as claim preclusion, a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001). We have noted that,

> [i]n the Eleventh Circuit, a party seeking to invoke the doctrine [of res judicata] must establish its propriety by satisfying four initial elements: (1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action.

*Id.* This case, however, does not involve "the same parties or their privies," nor "the same causes of action." *Id.* With respect to the third element, while South River may have intervened, South River was not a party to the consent decree. *See Com. Union Ins. Co. v. Westrope*, 730 F.2d 729, 732 (11th Cir. 1984) ("A consent judgment is binding only upon those parties consenting thereto." (quoting *Botz v. Helvering*, 134 F.2d 538, 545 (8th Cir. 1943))). And as to the fourth element, the claims in the instant suit could not have been raised in the 2010 suit because the new claims are based on DeKalb County's CWA violations after the entry of the 2011 consent decree.

(N.D. Ga. Dec. 20, 2011). The stated objectives of the consent decree are for DeKalb County "to use its best efforts to prepare and implement all plans, measures, reports, and construction, maintenance, and operational activities . . . to achieve the goals of: (1) full compliance with the CWA, the [Georgia Water Quality Control Act], and the regulations promulgated thereunder, and (2) the elimination of all [sanitary sewer overflows]." The decree requires DeKalb County to pay a one-time civil penalty of $453,000: $226,500 to the United States and $226,500 to the State of Georgia. It also requires DeKalb County to expend at least $600,000 on remedial measures benefiting areas impacted by prior discharges.

The consent decree contains numerous provisions requiring DeKalb County to remediate its wastewater collection and transmission system. For example, the consent decree requires DeKalb County to implement a comprehensive program "to ensure effective [c]apacity, [m]anagement, [o]perations and [m]aintenance" of the sewer system. The consent decree establishes timelines for DeKalb County to develop and submit certain programs and plans to the EPA or GDNR[2] for review and approval. These programs include an emergency response plan and a sewer mapping program to provide DeKalb County with

_____

[2] The consent decree requires submission to "EPA/EPD." As defined by the consent decree, EPA, of course, refers to "the United States Environmental Protection Agency," and EPD refers to "the [GDNR] Environmental Protection Division."

6                    Opinion of the Court                 20-13651

better information about its sewer system. The sewer rehabilitation plan requires DeKalb County to identify "priority" areas[3] requiring immediate improvement, submit to EPA/GDNR a rehabilitation program for those areas, and rehabilitate those areas within a specified timeframe. DeKalb County is also required to identify "non-priority" areas.[4] These areas are subject to assessment and rehabilitation under a separate program that does not have a specific deadline for completion.

The consent decree contains other notable provisions, such as those requiring DeKalb County to develop a "computer-based dynamic hydraulic model"[5] with a lengthy set of requirements and

---

[3] As of 2018, the priority areas for remediation included approximately 838 miles of sewer line, representing 31% of the sewer line in DeKalb County's wastewater collection and transmission system. According to South River's amended complaint, DeKalb County has acknowledged that it will not meet the deadline for rehabilitating priority areas, and indeed, the deadline has passed.

[4] The non-priority areas represent the remaining approximately 69% of DeKalb County's sewer line. South River alleges that in 2017 and 2018, "there was a greater volume of sewage spilled in non-[p]riority [a]reas than in [p]riority [a]reas."

[5] According to the amended complaint, "[a] sewer system hydraulic model is a mathematical model of a fluid introduced into a wastewater sewer at various rates and pressures. It is used to provide an understanding of the hydraulic behavior of the system under variable conditions so utilities can make informed decisions concerning planning and capital improvements." A dynamic hydraulic model is more accurate than a steady-state model, which holds "certain parameters" constant and uses less data.

a 2017 deadline.[6]  Additionally, it requires that DeKalb County pay prospective penalties for noncompliance and failure to timely complete any of the specified remedial actions.  For example, for each day DeKalb County fails to meet the priority area rehabilitation deadline, it will be charged anywhere from $1,000 to $3,000 per day.

The consent decree also includes a disclaimer: the United States and the State of Georgia do not "warrant or aver in any manner that the County's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA."  It also states that it "may be terminated when [DeKalb County] has satisfactorily completed performance of its compliance" and "fulfilled all other material obligations of this Consent Decree."  Finally, the consent decree provides that "[t]he Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes . . . or effectuating or enforcing compliance with the terms of this Consent Decree."  To date, the consent decree has not been terminated.

In May 2020, the United States and the State of Georgia moved to reopen the 2010 litigation.  They agreed to certain

---

[6] In 2015, DeKalb County proposed (and the EPA approved) the use of a static model instead of a dynamic one because the static model could be developed and implemented more quickly.  The parties to the consent decree agreed to this change, but did not seek court permission.  However, this change was memorialized in the court-approved 2021 modifications to the consent decree.

modifications to the consent decree: an extension of the deadlines for the priority areas, the implementation of a new dynamic hydraulic model that DeKalb County will use for better management of wastewater, the addition of 103 additional priority work projects, and the payment of additional fines for failure to meet the original deadlines. The district court approved the modifications in September 2021.[7]

### B. Procedural Background

In July 2019, South River mailed DeKalb County a notice letter, as required under 33 U.S.C. § 1365(b), setting forth its intent to file a citizen suit under the CWA.[8] Two months later, South

---

[7] During the public comment period for the proposed modification, South River raised the same concerns that it puts forth in this appeal.

[8] DeKalb County argues that South River did not provide sufficient pre-suit notice under 33 U.S.C. § 1365(b)(1)(A) because South River's notice lacked specifics about "DeKalb's alleged system deficiencies; . . . the requirements of DeKalb's MS4 Permit; . . . [and] for spills that occurred after the filing of this lawsuit." This argument lacks merit. Section 1365 requires pre-suit notice before a citizen suit under the CWA. *See id.* The CWA's pre-suit notice provision states:

> No action may be commenced—
>
> (1) under subsection (a)(1) of this section—
>
>> (A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . . .

River filed a complaint against DeKalb County in the Northern District of Georgia asserting one count of CWA violations under § 1311, which prohibits the non-compliant discharge of pollutants, and § 1342, which outlines the requirements for compliant discharges under the NPDES permit system. South River sought broad injunctions requiring DeKalb County to "cease the discharge of wastewater into waters of the United States . . . except in compliance with NPDES Permits," "take all actions necessary to cease the illicit discharge of sewage spills," and "comply with all terms and conditions of coverage under its NPDES Permits." The complaint also requested monetary relief—civil penalties for violations of the CWA and litigation costs and reasonable attorney's fees for South River.

In March 2020, DeKalb County moved to dismiss South River's amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and, alternatively,

---

*Id.* South River sent several DeKalb County officials a notice of its intent to sue on July 15, 2019, specifying DeKalb County's violations for discharging pollutants in violation of the terms of 33 U.S.C. § 1311(a). Under our precedent and EPA regulations, the notice must include, *inter alia*, sufficient information for the recipient to identify "the specific [CWA] standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, [and] the date or dates of such violation." *See* 40 C.F.R. § 135.3(a); *Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1329 (11th Cir. 2007). South River met these requirements by identifying DeKalb County's sewage spills by structure, cause, source, and date.

under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. DeKalb County argued that the district court had no jurisdiction to hear the claim because the consent decree and the EPA's enforcement of it establishes "diligent prosecution" that bars the claim under 33 U.S.C. § 1365(b)(1)(B), which states, "[n]o action may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States . . . to require compliance with the standard, limitation, or order . . . ."[9] South River argued that its claim was not barred by the diligent prosecution bar because the consent decree did not "require compliance" with the CWA. That is, because the consent decree did not require repairs in non-priority areas, DeKalb County could comply with the consent decree while still failing to comply with the CWA. South River also pointed to DeKalb County's admission that it would not meet the consent decree's deadline for priority-area rehabilitation as further evidence of non-compliance with the CWA.

The district court determined that the diligent prosecution bar is not jurisdictional and, therefore, Rule 12(b)(6), rather than Rule 12(b)(1), governed. The district court then concluded that

---

[9] DeKalb County also argued below that South River lacked standing, failed to provide sufficient pre-suit notice, was barred by res judicata, and was unlawfully attempting to sue to enforce the consent decree as a third party. We address standing in Part A of the discussion section, res judicata in footnote 1, and pre-suit notice in footnote 8. The unlawful enforcement issue is not argued on appeal.

South River's claims addressed the same CWA violations that formed the basis of the 2010 government suit that resulted in the consent decree, and, after affording the government a "heavy presumption of diligence," held that the diligent prosecution bar of § 1365 applied and granted DeKalb County's motion to dismiss. South River appealed.

## II.    Discussion

"We review *de novo* the district court's grant of a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *McGroarty v. Swearingen*, 977 F.3d 1302, 1306 (11th Cir. 2020) (quotations omitted).[10]    "We also review issues of statutory interpretation *de novo*." *United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1223 (11th Cir. 2012) (quotations omitted).

   *A.  Standing*

---

[10] Because no party disputes either the authenticity or importance of the public records attached to DeKalb County's motion to dismiss—including charts cataloging some of its rehabilitation programs, copies of its correspondence with EPA regarding the imposition of civil penalties, and copies of annual reports from the DeKalb County Department of Watershed Management—we will consider them too. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) ("[A] document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed.").

DeKalb County argues that South River and Echols lack standing to sue.  DeKalb County's main contentions are that South River has not been injured by DeKalb County's CWA violations and that, even if it has been injured, the injury is not redressable.

"The judicial power of the federal courts is limited by Article III of the U.S. Constitution.  We may exercise jurisdiction only over 'Cases' and 'Controversies.'"  *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (quoting U.S. Const. art. III, § 2).  To satisfy Article III's case or controversy requirement, which is "the irreducible constitutional minimum of standing, a plaintiff must, generally speaking, demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Id.* (quotations omitted).  This injury must be concrete.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).

We turn first to DeKalb County's challenge to the injury suffered by South River.[11]  An organization has standing to redress an injury suffered by its members without showing an injury to the association itself.  *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) ("In order to sue on behalf of its members . . . the rule in this Circuit is that organizational plaintiffs

---

[11] There are two ways to establish standing for organizational plaintiffs—the diversion-of-resources theory and the associational standing theory.  *Arcia*, 772 F.3d at 1341.  In this case, South River argues it has associational standing.

need only establish that at least one member faces a realistic danger of suffering an injury." (quotations omitted)). To establish standing to enforce the rights of its members, an organization must show that (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

South River meets the first requirement of associational standing—*i.e.*, its members would have standing to sue in their own right—because its members use the South River and Chattahoochee watersheds for recreation and aesthetic enjoyment and are injured when those uses are limited due to pollution. *See id.*; *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1241 (11th Cir. 2022) ("An individual can meet her burden of establishing that injury at the pleading stage by attesting that [s]he uses . . . an area affected by the alleged violations and that h[er] aesthetic . . . interests in the area have been harmed." (quotations omitted)). Moreover, "the rule in this Circuit is that organizational plaintiffs need only establish that at least one member faces a realistic danger of suffering an injury." *Arcia*, 772 F.3d at 1342 (quotation omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, South River satisfied our requirement by identifying one specific member, plaintiff Echols, who has

suffered a cognizable injury because she has used the South River and Chattahoochee watersheds less due to pollution.

As to the second requirement of associational standing—*i.e.*, the "interests at stake are germane to the organization's purpose"—South River's interests in this litigation qualify because it is a nonprofit membership organization with the goal of restoring the water quality of the Chattahoochee and South River watersheds. *Arcia*, 772 F.3d at 1342.

Finally, South River meets the third requirement of associational standing—*i.e.*, that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit"—because South River is seeking civil penalties, injunctive relief, and litigation costs, not damages.[12] *Id.*; *see United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members [however] such participation would be required in

---

[12] In their amended complaint, South River seeks an order requiring DeKalb County to "pay civil penalties for violations of the CWA." Civil penalties are paid to the government unlike damages that would be paid to South River's members. *Compare Damages*, Black's Law Dictionary (11th ed. 2019) ("Money claimed by, or ordered to be paid to, a person as compensation for loss or injury."), *with Penalty*, *Black's Law Dictionary* (11th ed. 2019) ("Punishment imposed on a wrongdoer, usually in the form of imprisonment or fine; especially, a sum of money exacted as punishment for either a wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss).").

an action for damages to an association's members . . . ."). Accordingly, South River and Echols have suffered an injury in fact for purposes of standing.

We next turn to DeKalb County's redressability argument. DeKalb County contends that the remedies South River seeks are already provided for in the consent decree and the court cannot unilaterally modify its terms. "Redressability is established, however, when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). At the motion to dismiss stage, the burden to prove redressability is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997).

The water quality of the Chattahoochee and South Rivers would likely be improved if the court implemented an injunction requiring DeKalb County to take additional steps to cease the discharge of wastewater and comply with its NPDES permits and the CWA. Although DeKalb County is correct that the court cannot unilaterally modify the terms of the consent decree, the court could impose other requirements to deal with the CWA violations. Accordingly, South River and Echols have adequately demonstrated for purposes of the motion to dismiss stage that a favorable decision would redress their injury. *Spear*, 520 U.S. at 171.

Because South River has demonstrated injury, causation,[13] and redressability, we conclude that South River has Article III standing.

### B. Jurisdiction

We now proceed to a second threshold question—this Court's jurisdiction over this suit. The district court held that 33 U.S.C. § 1365(b)(1)(B)'s diligent prosecution bar is not jurisdictional. DeKalb County argues that the diligent prosecution bar is jurisdictional and that the district court should have dismissed the case under Rule 12(b)(1) for lack of subject matter jurisdiction rather than under Rule 12(b)(6) for failure to state a claim.

DeKalb County did not file a cross-appeal to raise this issue, but we "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). "We review de novo a district court's determination of whether it has subject-matter jurisdiction." *Gupta v. McGahey*, 709 F.3d 1062, 1064–65 (11th Cir. 2013).

---

[13] Because causation is plainly apparent, it was not contested below or in this appeal. Nonetheless, we assess causation and conclude that South River's injury (*i.e.*, pollution in the South River and Chattahoochee watersheds) is "fairly traceable" to DeKalb County's actions (*i.e.*, polluting those rivers in various ways). *Greater Birmingham*, 992 F.3d at 1316.

In examining § 1365(b)(1)(B)'s diligent prosecution bar, "we must begin, and often should end as well, with the language of the statute itself." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (*en banc*) (quotation omitted). Courts must look to the plain meaning of the statute, and "presume that a legislature says in a statute what it means and means in a statute what it says there." *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F.3d 986, 990 (11th Cir. 2008) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

Importantly, in the jurisdictional context, the Supreme Court has warned courts about the ill effects of "drive-by jurisdictional rulings." *Arbaugh*, 546 U.S. at 511–14. The Supreme Court has "urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Courts such as ours should not confuse jurisdictional rules with "claim-processing rules" that "promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Id.*; *see also Wilkins v. United States*, 598 U.S. __, 143 S. Ct. 870, 876 (2023) (emphasizing the difference between "mundane claims-processing rule[s]" and "procedural bar[s] with jurisdictional consequences" (quotation omitted)).

To determine whether a statutory rule is jurisdictional, we look for a clear statement from the legislature. *Arbaugh*, 546 U.S. 515–16. "[W]hen Congress does not rank a statutory limitation on

coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Id.* at 516; *see also Henderson*, 562 U.S. at 436 ("[W]e look to see if there is any clear indication that Congress wanted the rule to be jurisdictional." (quotations omitted)). Rather than looking for "magic words," courts should look at the provision's context and the Supreme Court's "interpretation of similar provisions." *Henderson*, 562 U.S. at 436. "When a long line of [the Supreme] Court's decisions left undisturbed by Congress has treated a similar requirement as jurisdictional, we will presume that Congress intended to follow that course." *Id.* (quotations and internal citation omitted).

Following the analytical framework laid out in *Arbaugh*, in *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010), the Supreme Court evaluated whether a provision "requir[ing] copyright holders to register their works before suing for copyright infringement" was jurisdictional. The Court concluded that the provision was not jurisdictional because (a) it was "not clearly labeled jurisdictional," (b) it was "not located in a jurisdiction-granting provision," and (c) not all statutory conditions requiring action before filing a lawsuit are "jurisdictional prerequisite[s]." *Id.* at 166.

Similarly, in *Henderson*, the Supreme Court determined that a statutory requirement—requiring veterans to "file a notice of appeal with the Veterans Court within 120 days"—was not jurisdictional. 562 U.S. at 431. The Court first looked to the provision for any "jurisdictional terms or refer[ences]," and

20-13651                Opinion of the Court                19

determined that there were none. *Id.* at 438. Next, the Court noted that the time limit was located within a subchapter entitled "Procedure," which was especially probative because a separate provision within that same subchapter was captioned "Jurisdiction; finality of decisions" and did not mention the time limit for appeals. *Id.* at 439–40. Accordingly, the Court held that the provision "does not have jurisdictional attributes." *Id.* at 441.

Subsection (b) of § 1365, which is entitled "Notice," states that "[n]o action may be commenced" if the EPA administrator or a state "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order . . . ." 33 U.S.C. § 1365(b)(1)(B). Clearly, the diligent prosecution bar in subsection (b)—under the "Notice" heading—is *not* labeled as jurisdictional which is important because Congress labelled subsection (a) "Authorization; [j]urisdiction," but chose not to label the diligent prosecution bar in the same way. *See id.* § 1365(a); *Henderson*, 562 U.S. at 439–40. Accordingly, because Congress deliberately located § 1365(b)(1)(B) outside the jurisdiction-granting provision, we must treat the notice requirement as nonjurisdictional. *See* 33 U.S.C. § 1365(b); *Henderson*, 562 U.S. at 439–40; *Arbaugh*, 546 U.S. at 516 ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.").

Looking to our sister circuits to see how they have answered this question, opinions are split. While the First, Third, and Fifth

Circuits have expressly held that the diligent prosecution bar is not jurisdictional,[14] the Fourth, Seventh, and Tenth Circuits have held that 33 U.S.C. § 1365(b) is jurisdictional.[15]   Most of the jurisdictional-side cases predated *Arbaugh*, however.   *See Chesapeake Bay Found. v. Am. Recovery Co.*, 769 F.2d 207, 208 (4th Cir. 1985); *Friends of Milwaukee's Rivers v. Milwaukee Metro.*

---

[14] *See Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*, 4 F.4th 63, 72 (1st Cir. 2021) ("For these reasons, we agree with the district court that the CWA's diligent prosecution bar is a mandatory claims-processing rule that does not implicate subject matter jurisdiction."); *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 123 (3d Cir. 2016) ("We conclude that the diligent prosecution bar of the Clean Air Act [which is identical to the CWA's diligent prosecution bar] is not a jurisdictional limitation."); *La. Env't Action Network v. City of Baton Rouge*, 677 F.3d 737, 749 (5th Cir. 2012) ("[W]e hold that the diligent prosecution bar is a nonjurisdictional limitation on citizen suits." (quotation omitted)).

[15] *Chesapeake Bay Found. v. Am. Recovery Co.*, 769 F.2d 207, 208 (4th Cir. 1985) (explaining that § 1365(b)(1)(B)'s "statutory bar is an exception to the jurisdiction granted in subsection (a) of § 1365, and jurisdiction is normally determined as of the time of the filing of a complaint"); *Friends of Milwaukee's Rivers & All. for Great Lakes v. Milwaukee Metro. Sewerage Dist.* ("*Friends II*"), 556 F.3d 603, 606 (7th Cir. 2009) ("The Act strips the courts of subject matter jurisdiction over citizens' suits where the State has timely commenced judicial or administrative enforcement actions."); *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1298 (10th Cir. 2005) (referring to § 1365(b)(1)(B) as a "jurisdiction-stripping provision").

*Sewerage Dist.* ("*Friends I*"), 382 F.3d 743, 754–55 (7th Cir. 2004);[16] *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1298 (10th Cir. 2005). As such, and because they align with our text-based inclination above, we follow the well-reasoned post-*Arbaugh* opinions of the First, Third, and Fifth Circuits. *See Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*, 4 F.4th 63, 72 (1st Cir. 2021); *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 123 (3d Cir. 2016); *La. Env't Action Network v. City of Baton Rouge*, 677 F.3d 737, 749 (5th Cir. 2012).

Simply put, because Congress has not clearly stated that the diligent prosecution bar is jurisdictional and other indicators of meaning also indicate that the provision is nonjurisdictional, we hold that § 1365(b)(1)(B)'s diligent prosecution bar is not jurisdictional. Thus, the district court was correct in evaluating the diligent prosecution bar under Rule 12(b)(6), rather than Rule 12(b)(1).

---

[16] Of note, this case returned to the Seventh Circuit three years after the 2006 *Arbaugh* decision. 546 U.S. at 500. In *Friends II*, the Seventh Circuit did not change its determination that the diligent prosecution bar was jurisdictional in light of *Arbaugh*. 556 F.3d at 606. The Seventh Circuit only mentioned the jurisdictional nature of § 1365(b)(1)(B) in passing because the state's actions were commenced *after* the citizen suit was initiated (*i.e.*, the diligent prosecution bar would not have been triggered anyway). *Id.*

### C. Diligent Prosecution Bar

The district court undertook a "two-part inquiry" to determine whether South River's case was barred by the diligent prosecution bar:

> First, a court must determine whether a prosecution by the state (or the EPA Administrator) to enforce the same "standard, order, or limitation" was pending on the date that the citizens' suit commenced. Second, if the answer to the previous question is affirmative, a court must also determine whether the prior pending action was being "diligently prosecuted" by the state [or EPA] at the time that the citizens' suit was filed.

See, e.g., Ohio Valley Env't Coal., Inc. v. Maple Coal Co., 808 F. Supp. 2d 868, 883 (S.D. W. Va. 2011). In answering those questions, the district court determined that the consent decree already addressed the "standard, order, or limitation" that South River sought to enforce with its citizen suit and that the prosecution of the consent decree was diligent enough to bar South River's citizen suit. We have not adopted this two-part framework before, but because the test stems directly from the statutory language and proves helpful in breaking the question into its component parts, we follow suit.

We address the first step of the analysis (i.e., whether there is prosecution by the government to enforce the CWA) by noting that South River has not argued that the EPA and GDNR are not prosecuting. Rather, South River has focused on step two by arguing that the existing consent decree does not constitute "diligent prosecution" because the decree's requirements are too

relaxed to qualify as "diligent." Accordingly, we do not belabor the point—we think it clear that the EPA and GDNR have been prosecuting the consent decree to enforce the CWA.[17]

We now move to step two and consider whether the government's prosecution has been "diligent" enough.

We begin step two by answering a threshold question that affects the rest of our analysis: What level of deference, if any, should we apply in determining whether the government's prosecution has been diligent? South River argues that the level of deference the district court applied—a "heavy presumption of diligence"—is contrary to the plain meaning of § 1365(b)(1)(B). DeKalb County, however, argues that a "heavy presumption of diligence" is appropriate because of the "intended role of the State

---

[17] Step one also considers whether the government's prosecution addresses the same standard or limitation that the citizen suit seeks to remedy. *Ohio Valley*, 808 F. Supp. 2d at 883 ("First, a court must determine whether a prosecution by the state (or the EPA Administrator) *to enforce the same 'standard, order, or limitation'* was pending on the date that the citizens' suit commenced." (emphasis added)). We agree with the district court that the issues South River raises in its instant suit overlap completely with the issues covered by the consent decree. That is, South River alleges that DeKalb County is violating the CWA by continuing to spill sewage at unacceptable rates—which is exactly what the consent decree seeks to remedy: "The express purpose [of the consent decree] is for [DeKalb County] to use its best efforts . . . to achieve the goals of: (1) full compliance with the CWA . . . and (2) the elimination of all [sanitary sewer overflows]." To the extent that South River argues the consent decree has been insufficient and that the EPA and GDNR have fallen short, we consider that argument under step two (whether prosecution has been "diligent").

as the primary enforcer of the [CWA]" and "the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems."

The district court, agreeing with DeKalb County, applied a "heavy presumption of diligence" to find that the government was "diligently prosecuting" the civil action, such that South River's action was barred by § 1365(b)(1)(B). The district court's "heavy presumption of diligence" standard originated in a 1986 district court case from Connecticut involving § 1365, which held that "[t]he court must presume the diligence of the state's prosecution of a defendant absent persuasive evidence that the state has engaged in a pattern of conduct in its prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith." *Conn. Fund for Env't v. Cont. Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986).[18]

The First, Second, Third, Fourth, Seventh, and Tenth Circuits all grant varying degrees of deference, ranging from a low of "some deference" to a high of "presumed" diligence. *See Cebollero-Bertran*, 4 F.4th at 74 ("The CWA's diligent prosecution bar emphasizes the primacy of government agencies in enforcing

---

[18] The district court's decision does not explain the origin of this presumption, but later courts have attempted to piece together its underpinnings. *See, e.g., Friends I*, 382 F.3d at 760 ("We surmise that this presumption is due not only to the intended role of the State as the primary enforcer of the [CWA], but also to the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems." (internal citation omitted)).

clean water standards. . . . We grant considerable, although not unlimited, deference to the agency's plan of attack." (quotation and internal citation omitted)); *Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991) (directing the district court to grant "some deference to the judgment of the state authorities"); *Grp. Against Smog*, 810 F.3d at 130 ("We note that the government's prosecution is entitled to great deference."); *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008) ("A CWA enforcement prosecution will ordinarily be considered diligent if the judicial action is capable of requiring compliance with the Act and is in good faith calculated to do so, and as the Association acknowledges in its opening brief, diligence is presumed." (quotations omitted)); *Friends I*, 382 F.3d at 760 ("We recognize that diligence on the part of the State is presumed."); *Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007) ("In sum, our evaluation of the EPA's diligence is quite deferential. Citizen-plaintiffs must meet a high standard to demonstrate that it has failed to prosecute a violation diligently."). We agree with our sister circuits that some level of deference is appropriate, but our conclusion is rooted primarily in the Supreme Court's observations about the role of citizen suits.

In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60 (1987), the Supreme Court instructed that citizen suits are meant to "supplement rather than . . . supplant governmental action." In other words, "[p]ermitting citizen suits for wholly past violations of the [CWA]

could undermine the supplementary role envisioned for the citizen suit." *Id.* Accordingly, permitting citizen suits and federal courts to second-guess the enforcement decisions of the EPA and state environmental agencies would be improper. *See id.* Digging in further, the Supreme Court has explained how citizen suits could undermine ongoing executive enforcement actions:

> Suppose . . . that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the [CWA] in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result.

*Id.* at 60–61.

Stated differently, "when the EPA chooses to enforce the CWA through a consent decree, failure to defer to its judgment [could] undermine agency strategy." *Karr*, 475 F.3d at 1197. For this reason, "[i]t would be unreasonable and inappropriate to find failure to diligently prosecute simply because [the defendant]

prevailed in some fashion or because a compromise was reached." *Ark. Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 380 (8th Cir. 1994). In sum, because we must follow the Supreme Court's instruction as to citizen suits and we agree with our sister circuits' well-reasoned decisions, we analyze "diligence" with at least some deference to the judgments of the EPA and GDNR.[19]

With the deference question answered to the extent necessary, we now determine diligence in this case. As a starting point, we note that the diligent prosecution bar "does not require government prosecution to be far-reaching or zealous;"rather, "[i]t requires only diligence." *Karr*, 475 F.3d at 1197. Accordingly, in examining diligence, we look to see "whether [the consent decree] is capable of requiring compliance with [the CWA]" and "is in good faith calculated to do so." *Friends I*, 382 F.3d at 760. And, critically, diligence is in no way tied to whether the government could have been more aggressive in its negotiations with the polluter. *See Piney Run Pres. Ass'n*, 523 F.3d at 459 ("[A] citizen-plaintiff cannot overcome the presumption of diligence merely by showing that the agency's prosecution strategy is less aggressive than he would like or that it did not produce a completely satisfactory result.").

We turn first to the consent decree itself because the terms of the decree are the building blocks of our analysis. The consent decree's express goal is for DeKalb County to achieve "full compliance with the CWA" and eliminate all its sanitary sewer

---

[19] Because we hold, *infra*, that the EPA and GDNR are diligently prosecuting a civil action to require compliance even with the lowest level of deference recognized by our sister circuits—"some deference"—we need not decide exactly what level of deference is required under the statute.

overflows. The provisions of the consent decree—from the penalties imposed on DeKalb County to the requirements that it implement various programs to stop future overflows and rehabilitate affected areas—support those goals. Indeed, the district court only approved the consent decree because it was capable of remedying DeKalb County's CWA violations: "The Consent Decree addresses and substantially resolves violations of the CWA . . . by [DeKalb County] and is calculated to bring [DeKalb County's] sewer infrastructure into compliance with the CWA."

The consent decree's goals alone are not enough, however, and we must also examine whether the EPA and GDNR have been diligent in overseeing the consent decree and requiring DeKalb County to live up to its end of the bargain. *Ohio Valley*, 808 F. Supp. 2d at 883 ("Second, [at step two,] a court must also determine whether the prior pending action was being 'diligently prosecuted' by the state at the time that the citizens' suit was filed."). We conclude that the EPA and GDNR have done more than enough to meet the diligence threshold.

First, we conclude that the EPA and GDNR have been diligent as evidenced by their continued penalization—according to the terms of the consent decree—of DeKalb County for noncompliance. *See Piney Run Pres. Ass'n*, 523 F.3d at 461 (considering the fact that a consent decree imposed "a daily fine" for the county's failure to comply with certain requirements as part of its conclusion that there was diligent prosecution). When it

20-13651                Opinion of the Court                29

initially entered into the consent decree, DeKalb County had to pay a large civil penalty to the EPA and GDNR.[20]  More important to showing the government's continued diligence, however, is the fact that *each year*, from 2012 to 2018, the EPA and GDNR have assessed penalties totaling nearly one million dollars against DeKalb County for its reported spills.[21]  The EPA and GDNR have been diligent in monitoring DeKalb County's progress and assessing sizeable fines to compel DeKalb County to comply with the consent decree.

South River disputes that the consent decree's penalty mechanism shows diligence because there is an economic incentive for DeKalb County to avoid remedying its CWA violations.  That is, South River contends that it is cheaper for DeKalb County to merely pay the fines than invest in sound infrastructure.  This argument is exactly the type of argument foreclosed by § 1365(b)(1)(B) because it second-guesses the compromise negotiated by the EPA and GDNR. *See Ark. Wildlife*, 29 F.3d at 380 ("It would be unreasonable and inappropriate to find failure to diligently prosecute simply because . . . a compromise

---

[20] In addition to its upfront penalty payment, the consent decree required other large-scale expenditures from DeKalb County including at least $600,000 on a supplemental environmental project.

[21] Further, the modifications to the consent decree also include that "EPA/[GDNR] have determined that it is appropriate to assess, and [DeKalb County] agrees to pay, *an additional civil penalty* which addresses [DeKalb County's] failure to implement the Consent Decree obligations in accordance with the original Consent Decree and the Spills from its WCTS through 2019."

was reached.").  Here, for example, the EPA chose to grant lower penalties in exchange for increased reporting requirements and other concessions from DeKalb County, and a citizen suit would interfere with that decision.  *See Piney Run Pres. Ass'n*, 523 F.3d at 461 ("As we have noted, [concessions or exchanges for other obligations are] precisely the type of discretionary matter to which we should defer.").  Finally, as we emphasized previously, "[s]ection 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous," but rather "requires *only* diligence." *Karr*, 475 F.3d at 1197 (emphasis added).  Whether South River agrees with the amount of the annual fines levied against DeKalb County is inconsequential because it is clear that the EPA and GDNR have been diligent in monitoring DeKalb County and imposing penalties for its noncompliance.

Second, we draw on the consent decree's terms that provide for the court to retain jurisdiction[22] and spell out the proper dispute resolution framework because we have seen the EPA and GDNR use these terms to diligently modify the consent decree.  *See Grp. Against Smog*, 810 F.3d at 129–30 (finding diligent prosecution when a consent decree contained similar provisions—including a continuing jurisdiction provision and a provision allowing the

---

[22] Specifically, the consent decree provides that: "The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XII and XIX, or effectuating or enforcing compliance with the terms of this Consent Decree."

20-13651                Opinion of the Court                31

government to "seek court intervention in the event of continuing violations"—because the "principal enforcement mechanism[s]" were in place so that a citizen suit would have been improperly duplicitous). While South River argues that the modifications to the consent decree—specifically the modifications to the hydraulic modelling requirements—show a lack of diligence, we reach the opposite conclusion.[23] *See Piney Run Pres. Ass'n*, 523 F.3d at 461 ("As we have noted, [concessions or exchanges for other obligations are] precisely the type of discretionary matter to which we should defer."). By engaging with DeKalb County throughout its pursuit of a better hydraulic model,[24] the EPA and GDNR made

---

[23] Similarly, further evidence of diligent prosecution arose in 2020, when the United States and Georgia filed a motion to reopen the case. The government did so to "apprise the Court of significant developments in this case, in anticipation of possible actions consistent with the Court's retained jurisdiction . . . of the Consent Decree." The parties agreed to modify the consent decree to increase the number of projects required of DeKalb County and the amount of penalties owed. Under the modification, DeKalb County must pay an "additional civil penalty" for failure to comply with the original consent decree schedule, complete 103 additional priority work projects, and implement a new program to ensure the wastewater system has adequate capacity to manage wastewater flows. These increased penalties and remedial programs show an ongoing and diligent effort by the EPA and GDNR to prosecute DeKalb County for its violations of the CWA.

[24] Relatedly, South River also argues that the EPA and GDNR are not diligently prosecuting because they have allowed modifications to the hydraulic model required under the consent decree so as to "delay [the modeling process] by a still unknown number of years." Even if we were to assume that South River's argument does not suffer from the same problem

certain tradeoffs that it felt were best in order to speed up the repair process. To the extent that modelling accuracy was a casualty in the negotiations (as South River argues), we are unable to conclude that implementing a less accurate system more quickly, on the one hand, is better than implementing a more accurate system that would take longer to implement, on the other. And, in any event, such a technically-dense determination is far outside our bailiwick as federal judges.

Third, and critically because the burden is on South River to overcome the deference we afford to the government in this context, we find the rest of South River's arguments unpersuasive. We address them in turn.

According to South River, the consent decree does not require "compliance" with DeKalb County's NPDES permits or the CWA because the consent decree imposes no timeline or deadline requiring DeKalb County to stop the spills or repair the sewer system in non-priority areas.[25] But there is no such

_____

as its other arguments (*i.e.*, the EPA and GDNR have discretion—especially given the technical complexity in this context), this consideration would not weigh heavily enough in South River's favor to overcome the combination of (a) the deference afforded to the government and (b) the numerous examples of the government's diligence that we have already considered.

[25] The parties agree that non-priority areas encompass most of DeKalb County's sewer lines and are subject to a rehabilitation program that does not have a specific deadline or timeline for completion, unlike the priority areas that had an initial deadline of eight and one-half years. The consent decree covers the same non-priority areas at issue here.

requirement in statute or case law. A mere lack of a date-certain compliance deadline is not dispositive because the consent decree contains other ongoing compliance requirements: DeKalb County must report all spills quarterly, semi-annually, and annually, and pay hefty fines for spills in both priority and non-priority areas. *See Piney Run Pres. Ass'n*, 523 F.3d at 461 (determining that the "absence of a final compliance deadline" did not indicate a lack of diligence in part because the consent decree had other requirements such as "immediate compliance with the thermal limitation" and "daily fine[s] for its violations"). The ability to designate some areas as priority with a deadline and some as non-priority[26] without a deadline is the type of discretionary decision that deserves deference.

Finally, South River argues that a consent decree can bar a citizen suit only when it "is stringent enough to prevent sewage

---

[26] South River also points to boilerplate language in paragraph 95 of the consent decree as evidence that the EPA did not intend the consent decree to require DeKalb County's compliance in non-priority areas. Paragraph 95 states, "The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that the County's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA . . . ." South River's argument is not persuasive. Setting aside the fact that the language is boilerplate language, we cannot conclude that paragraph 95 is a better indication of the consent decree's purpose than the language defining the decree's purpose to be achieving "full compliance with the CWA." At absolute best, the goal provision and paragraph 95 offset one another which is not enough to move the needle in South River's favor.

spills and other [CWA] violations." However, the authority South River cites for this rule—*Friends II*—states something different. In *Friends II*, the Seventh Circuit explained that "a diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator with whom it settled regarding their intent with respect to the effect of the settlement"; instead, courts must "engage[] in a substantive analysis of whether the [settlement between the state and violator] *was capable of requiring compliance* with the [CWA] and was in good faith calculated to do so." 556 F.3d at 606 (emphasis added) (quotations omitted). *Friends II* does *not* state that a consent decree can bar a citizen suit only if it prevents all future CWA violations. Rather, it stands for the proposition that the consent decree must be capable of requiring compliance. The consent decree in the instant case satisfies this standard because its express goal is "full compliance with the CWA," its requirements support that goal, and—as explained above—it has been diligently prosecuted by the government.

## III.    Conclusion

At bottom, South River wants the current consent decree discarded in favor of a more muscular alternative. The fact that South River disagrees with the prosecution strategy undertaken by the EPA and GDNR, however, is not enough to prove that the EPA and GDNR have failed to diligently prosecute DeKalb County's CWA violations. To the contrary, the record shows that the EPA

and GDNR have been diligent which means that South River's suit is barred under 33 U.S.C. § 1365(b)(1)(B).  Accordingly, we affirm the district court's grant of DeKalb County's motion to dismiss.

**AFFIRMED.**

20-13651                    Newsom, J., Concurring                    1

NEWSOM, Circuit Judge, concurring:

I concur in the Court's judgment and join the majority opinion. A brief word about the Clean Water Act's so-called "diligent-prosecution bar": In relevant part, that provision states that "[n]o [citizen-suit] may be commenced . . . if the [EPA] Administrator or State has commenced and is diligently prosecuting a civil . . . action in a court of the United States . . . to require compliance with" any of the Act's requirements. 33 U.S.C. § 1365(b)(1)(B). As the majority opinion explains, the sole basis for South River's contention that § 1365(b)(1)(B)'s bar doesn't apply here is that the government's conduct of its civil-enforcement action hasn't been "diligent." South River hasn't argued that, at the time it filed its citizen suit, the government was not, in the statute's terms, "prosecuting a civil . . . action in a court of the United States" *at all*.

Speaking only for myself, I'll just say that if South River had made that argument, I think it'd be a close question, at least as a matter of statutory interpretation. Section 1365(b)(1)(B) is framed in the present tense: "is diligently prosecuting." At the time South River filed its citizen suit in September 2019, the government's civil-enforcement action had already gone to judgment, a consent decree had been entered, and the "[c]ivil [c]ase [had been] terminated." Doc. 39, *United States v. DeKalb County*, No. 1:10-CV-4039. The threshold § 1365(b)(1)(B) question would then turn on whether the government's ongoing enforcement of its consent decree constituted present "prosecuti[on]" or whether, instead,

2                    Newsom, J., Concurring                    20-13651

prosecution and enforcement are different things—*i.e.*, whether, perhaps, one *prosecutes* a case in order to obtain a judgment and then, having gotten it, proceeds to *enforce* it.  I can see reasonable arguments going both ways.

In any event, it's neither here nor there because South River hasn't made the "is . . . prosecuting" argument, but rather has focused solely on whether the government's prosecution has been "diligent."  The Court correctly concludes that it has been.